**GENERAL MILL SUPPLY COMPANY, Manuel Rotenberg and Milton Rotenberg, Plaintiffs,**

v.

**SCA SERVICES, INC. and Hale & Dorr, Defendants.**

Civ. A. No. 79–73053.

United States District Court, E. D. Michigan, S. D.

Jan. 28, 1981.

Jaffe, Snider, Raitt, Garratt & Heuer, P.C. by C. William Garratt, Eddie Morris, Detroit, Mich., for plaintiffs.

Hill, Lewis, Adams, Goodrich & Tait by Timothy D. Wittlinger, Richard C. Sanders, Detroit, Mich., for defendant SCA Services, Inc.

Dickinson, Wright, McKean, Cudlip & Moon by Robert S. Krause; Robert P. Young, Jr., Detroit, Mich., for defendant Hale & Dorr.

## OPINION

GILMORE, District Judge.

"But the bottom line should always be this: where it is a question of ethics, the answer is 'no'. There is no room for 'close' questions of professional propriety, particularly at a time when public trust in and respect for the legal profession is not at its highest level." [1]

The issue before this Court is whether the law firm of Jaffe, Snider, Raitt, Garratt and Heuer should be disqualified from representing plaintiffs because of Disciplinary Rules 5–101 and 5–102 of the Code of Professional Responsibility. The Court concludes that the law firm is disqualified.

The subject of this motion has had a long history. The matter has been before Judge Boyle of this Court, who has entered at least three orders pertaining to defendants' motion for disqualification. The case is now before this Court upon a motion for reconsideration of Judge Boyle's most recent order, Judge Boyle having transferred the case to this Court.

C. William Garratt is a partner in the law firm of Jaffe, Snider, Raitt, Garratt and Heuer (hereinafter Jaffe, Snider). Mr. Garratt represented plaintiff, General Mill, in a prior Illinois lawsuit in which General Mill was a third party defendant. General Mill prevailed in that action, obtaining a verdict on its counterclaim against SCA, the third party plaintiff.

1. *GAC Corporation v. Mahoney Typographers,* 66 Mich.App. 186, 192, 238 N.W.2d 575 (1975).

In the present lawsuit, General Mill alleges that defendants SCA and their counsel in the prior litigation, the law firm of Hale & Dorr, impleaded General Mill for entirely improper reasons and thereby abused process and maliciously prosecuted General Mill. C. William Garratt, in an affidavit filed in response to a summary judgment motion, alleges that attorneys from Hale & Dorr impleaded General Mill in order to obtain favorable testimony in its case against Lucky Stores.

It is the basic position of defendants that neither Mr. Garratt nor the Jaffe, Snider firm can ethically represent plaintiffs because Mr. Garratt will be a witness at trial. It is uncontroverted that Mr. Garratt will be a witness for plaintiff at trial, and it appears clear that Mr. Jaffe ought to be called as a witness at trial.

In an order issued from the Bench on April 17, 1980, Judge Boyle ruled that the entire law firm was disqualified. On May 13, 1980, Judge Boyle sua sponte issued an order requiring that the disqualification order be reconsidered. She stated the issues to be whether an evidentiary hearing was required prior to her ruling, and whether the entire law firm should be disqualified.

On September 29, 1980, Judge Boyle issued her final order, holding there was no requirement for an evidentiary hearing, and modifying her first order to allow the Jaffe, Snider firm to continue as counsel, but disqualifying Mr. Garratt from participating in the case as a lawyer.

In her opinion from the bench, Judge Boyle said, inter alia:

"I am persuaded that the Sixth Circuit recognizes a substantial interest in the right of a litigant to counsel of its choosing so long as the litigant is informed of any ethical problems that could be presented by having that attorney appear in the action. . . .

. . . . .

"Because, I do not believe, on further reflection, that allowing the law firm of Jaffe, Snider, Raitt, Garratt & Heuer, P.C. to remain in this case as Plaintiff's counsel would have a serious prejudicial impact on Plaintiff or Defendants and because I doubt that the integrity of the judicial process would be undercut in any meaningful way by this decision, the Court will permit the law firm to continue in the capacity of plaintiff's counsel. . . However, the previous ruling disqualifying not only Mr. Garratt but also his law firm will be modified so that only Mr. Garratt is disqualified from conducting the trial of this matter or appearing at counsel table. That portion of the disqualification order relating directly to Mr. Garratt, then, will stand for the reasons originally offered. As for Mr. Garratt's participation in the case prior to trial, I observe specifically that he should not be involved in the deposition of Mr. Donnelly if that deposition is taken. This ruling is made with the recognition that the deposition or circumstances surrounding it quite possibly could be placed before the jury and would put Mr. Garratt in the position, again, of counsel for the Plaintiff and of witness. Apart from this specific limitation, Mr. Garratt may participate in the preparation of this case with the caveat that he must take care to limit his participation in areas which might lead to disclosure at trial of his role in preparation of the case. If a misjudgment results in a situation at trial where Mr. Garratt is seen as an attorney of record, then Plaintiff should be prepared to accept that the Court will have to take appropriate steps to account for the misjudgment and to preserve the intent of this ruling."

On October 9, 1980, defendants filed a motion for reconsideration in which they requested this Court to disqualify the Jaffe, Snider firm, or certify the issues to the Court of Appeals. They contend that new facts, discovered since Judge Boyle's ruling, require this result. Defendants state that in the early 1970's the Jaffe, Snider firm did substantial legal work for defendant SCA Services, Inc., and that, as a result of a dispute, defendant SCA dropped the Jaffe, Snider firm as its counsel. Defendants state that this early dispute may have given

rise to some motivation on Jaffe, Snider's part to retaliate.

In argument, the Jaffe, Snider firm admitted that they at one time represented SCA Services, Inc., but stated that they ceased to represent them only because there was no more legal work for them to do in Detroit. This presents a clear issue of fact, requiring the testimony of Mr. Jaffe at trial. The reasons the SCA–Jaffe, Snider relationship terminated could have bearing on the credibility of Mr. Garratt.

Plaintiffs' abuse of process claim is based to a large extent upon conversations between Mr. Garratt and members of the defendant firm of Hale & Dorr. In particular dispute is a conversation between Mr. Garratt and James C. Donnelly, Jr., of Hale & Dorr, where Mr. Donnelly is alleged to have stated that SCA's purpose in filing a third party complaint against General Mill was to elicit favorable testimony from plaintiffs that could be useful in SCA's action against Lucky. There were two other conversations between Mr. Garratt and members of defendant Hale & Dorr. Mr. Garratt concluded from these conversations that SCA and Hale & Dorr were attempting to make his clients commit or suborn perjury.

Mr. Garratt and Mr. Donnelly will have to be called as witnesses to recount their conversations. Both will be subject to extensive cross-examination. Defendants assert that such cross-examination must probe the financial arrangements within the Jaffe, Snider firm and its fee agreement with General Mill. Defendants contend that the Jaffe, Snider firm's money interest in the suit, and thereby Mr. Garratt's interest in the suit, sustains an inference of bias, damaging Mr. Garratt's credibility as a witness.

DR 5–101(B), of the Code of Professional Responsibility, provides:

"(B) A lawyer shall not accept employment in contemplated or pending litigation if he knows, or it is obvious, that he or a lawyer in his firm ought to be called as a witness, except he may undertake the employment and he or a lawyer in his firm may testify:

(1) If the testimony will relate solely to an uncontested matter.

(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm.

(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case."

DR 5–102(A) provides:

"(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns, or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial, and his firm, if any, shall not continue representation in the trial, except that he may continue the representation, and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4)."

The basic issue before the Court is whether, under DR 5–101 and DR 5–102, the entire firm should be disqualified. Mr. Garratt is disqualified; no one contests that seriously at this time. Moreover, it is obvious that Mr. Jaffe will have to be called as a witness, and because his testimony concerns contested matters relating to his former relationship with SCA Services, he also is individually disqualified from representing plaintiffs.

The rationale for disqualifying the attorney witness is found in Ethical Consideration 5–9 of the Code of Professional Responsibility:

"EC 5–9 Occasionally a lawyer is called upon to decide in a particular case whether he will be a witness or an advocate. If a lawyer is both counsel and witness, he becomes more easily impeachable for in-

terest, and thus may be a less effective witness. Conversely, the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility. The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively."

It is clear that the provisions of the Code of Professional Responsibility are applicable and control the decision in this matter. Rule A–4 (Appendix A) of the Local Rules for the United States District Court for the Eastern District of Michigan provides in pertinent part as follows:

"b. Acts or omissions by an attorney admitted to practice before this Court, individually or in concert with other person or persons, which violate the Code of Professional Responsibility adopted by this Court shall constitute misconduct and shall be grounds for discipline, whether or not the act or omission occurred in the course of an attorney-client relationship. The Code of Professional Responsibility adopted by this Court is the Code of Professional Responsibility adopted by the Supreme Court of Michigan, as amended from time to time by that state court."

Disciplinary Rules 5–101 and 5–102 adopted by the Supreme Court of Michigan are identical with those of the American Bar Association.

Plaintiffs contend that the motion should be denied. They first say that none of the information that defendants claim to be newly discovered is, in fact, newly discovered. They say defendants have long known that the firm of Jaffe, Snider represented SCA in a limited capacity, and their contention that Jaffe, Snider performed substantial legal work for SCA is erroneous. Plaintiffs further submit that evidence obtained through the discovery process reveals that defendants' motion to disqualify

was brought entirely for tactical purposes. They rely upon the following note authored by Jerome Facher, of Hale & Dorr:

"Jim, I do not want to lose a disqualification motion either as to Garratt or his firm. Please work with Krause and initiate suggestions and drafts, rather than wait for him. This is a crucial motion, *and if we win it the whole case will turn around.*" (emphasis added)

Finally, plaintiffs say they fully understand the consequences of their choice of Jaffe, Snider. They understand that wide-open cross-examination will reveal Mr. Garratt's representation of plaintiffs. Nevertheless, plaintiffs say they have chosen Jaffe, Snider and that choice should be given great weight.

DR 5–101 and 5–102(A) are premised upon the notion that unnecessary prejudice to both litigants and the practice of law can be avoided if lawyers are not allowed to operate as counsel in cases where they also testify as material witnesses.

However, case law demonstrates that courts are unwilling to strictly apply DR 5–101 and 5–102 in the case of the lawyer-witness, and particularly in the case of the law firm witness. Before disqualification can come about, the cases seem to require a balancing and a showing of prejudice to the client's case, or prejudice to opposing counsel and party, or prejudice to the trial process and public perception of it.

In *International Electronics Corporation v. Flanzer*, 527 F.2d 1288, 1294 (CA2 1975) the Court discussed the justification for the rule. It said:

"Third, in searching for the rationale for the Rule, we must consider the ethical consideration which underlies it. The arguments for disqualification of the attorney from acting as trial counsel when he, himself, is to be a material witness, have been variously stated. See 6 Wigmore on Evidence ¶ 1911 (3rd Ed. 1940). The ultimate justification for the disqualification rule, in Wigmore's view, was that the public might think that the lawyer is distorting the truth for the sake of his client. Another argument for disqualifi-

cation is that the lawyer-witness will vouch for his own credibility in summing up to the jury—a powerful means of support for his own credibility. The argument that such tactic is to the detriment of his client obviously defeats itself. But the argument that it is unfair to the opponent has some merit. It is difficult, indeed, to cross-examine a witness, who is also an adversary counsel concerning matters of fact, and, more particularly, on matters impeaching his credibility, within the bounds of propriety and courtesy owed to professional colleagues."

In discussing the problem, The American Bar Foundation's *Annotated Code of Professional Responsibility*, (American Bar Foundation, 1979) states:

"As an advocate the attorney is said to be placed in the 'unseemly' position of arguing his or her own credibility (citing cases)...

"The most questionable rationale is that opposing counsel may be handicapped in challenging the testimony of the attorney-witness (EC 5–9). This assertion is based upon the premise that a lawyer's professional courtesy will inhibit him or her from fully cross-examining a professional colleague... It is equally arguable, however, that an attorney's stake in litigation, even if the attorney is only a member of the trial counsel's firm, will make him or her more susceptible to damaging impeachment... It has also been pointed out that the opposing counsel is obligated under Canons 6 and 7 to serve the client competently and zealously... Moreover, the attorney who withdraws to testify does not lose the professional status that purportedly inhibits opposing counsel, and disqualification should therefore be no solution....

"Finally, it is argued, because the two roles are inconsistent (the advocate is partisan; the witness is detached), the attorney's performance of each will suffer... See *People v. Smith*, 13 Cal. App.3d 897, 91 Cal.Rptr. 786, 793–94 (1971), in which the court held that the 'switching of hats' as advocate and witness was likely to seriously hamper the decision-making function of the jury, which would be unable to decipher the proper sphere of the two distinct roles. One commentator has concluded that the essential underlying rationale for the rule is less a concern for the client's interest than for the preservation of the attorney's unique role as an independent and objective proponent of rational argument; the purpose of the rule is to preserve the distinction between advocacy, which is based on reason and is subject to objective evaluation, and testimony, which is based on the witness's moral qualities and is evaluated in terms of individual credibility. Therefore, *client consent is irrelevant and is properly omitted from the Code." Id.* 213, 214 (emphasis added)

In a careful analysis of the problem, Judge Finesilver, in *Greenebaum-Mountain Mortgage Company v. Pioneer National Title Insurance Company*, 421 F.Supp. 1348, 1353 (1976) said this:

"A critical question then is not whether a lawyer who has some relationship to the prosecution of a trial may appear as a witness at that trial, but whether the litigation can be conducted in fairness to all, with all parties properly represented, if the attorney testifies... Sanctions should not be imposed, especially the sanction of the complete disqualification of a law firm, unless the claimed misconduct in some manner taints the underlying trial or the legal system...."

A literal reading of the rule clearly requires that Jaffe, Snider be disqualified, unless an exception applies. As has been noted previously, however, the Court must examine the potential prejudice to the parties, the profession, or the judicial process so as to apply DR 5–101 and 5–102 within the limits of their underlying rationales. In making this inquiry, the Court is mindful that this is not a routine case. There is great potential for harm if Jaffe, Snider remains as counsel because of the nature of the case, the tension between the parties, and the allegations and cross-allegations of

misconduct. The credibility of Mr. Garratt, Mr. Donnelly, and, to a lesser degree, Mr. Jaffe, will undoubtedly form a central feature of the trial. Hale & Dorr, a law firm, is charged with abuse of process and malicious prosecution. Very few more serious charges could be made against a law firm.

Under these circumstances, it would be difficult to conduct a trial with "fairness to all." The jury would inevitably encounter difficulties in discerning the difference between impeachment of Mr. Garratt and Mr. Jaffe, and impeachment of plaintiff's counsel (the Jaffe, Snider firm). Moreover, the entire proceeding would be tainted by the harsh recriminations hurled by the parties and witnesses, and from which the firm of Jaffe, Snider could not be shielded.

Certainly the credibility of the entire law firm would be at issue through every twist and turn of the trial. In light of these facts, prejudice to the defendant's case, the plaintiff's case, and the entire trial process must be presumed.

It has been argued that plaintiffs have a strong right to counsel of their choice. *Melamed v. ITT*, 592 F.2d 290 (CA6 1979). However, as has been stated, DR 5–101 and 5–102 are not premised upon the parties' consent. Assuming that consent is a factor, it is impossible for the plaintiffs to waive the prejudice to the defendants, or the prejudice to the trial process.

Jaffe, Snider further argues that it should be allowed to remain in the case because of the exception found in DR 5–101(B)(4), which allows a law firm and a lawyer to remain as counsel as to any matter if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm in the particular case.

Two elements must be demonstrated under the fourth exception—distinctive value resulting in substantial hardship. Thus, a showing of substantial hardship by itself is not sufficient to invoke the protection of DR 5–101(B)(4).

As pointed out in the comment to Canon 5 in *Annotated Code of Professional Responsibility*, supra, judicial opinions interpreting this provision reflect no general agreement on its specific meaning, and the opinions are more likely to indicate what the language does not mean. In *Draganescu v. First National Bank*, 502 F.2d 550 (CA5 1974), cert. den. 421 U.S. 929, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975), the Court held that long term familiarity with clients and their language, where they spoke Rumanian, was insufficient to invoke the exception because the attorney could still work as a translator.

In *U.S. ex rel. Sheldon Electric Company v. Blackhawk Heating & Plumbing Inc.*, 423 F.Supp. 486, (S.D.N.Y.1976) the Court held that a ten-year history of representation by a particular law firm of the client, and the spending of approximately 450 hours of time in connection with the multitude of claims that comprised the plaintiff's case, was insufficient to show the distinctive value of the attorney or the firm. The court held this even though the motion for disqualification was not made until the day of trial. The court pointed out (page 489):

"Aside from the likelihood of actual prejudice . . . , the Court must be mindful of the possibility that testimony by an attorney in the case may lead the public to think 'that lawyers may as witnesses distort the truth', thereby diminishing the public's respect for and confidence in the profession . . . Where doubt may becloud the public's view of the ethics of the legal profession and thus impugn the integrity of the judicial process, it is the responsibility of the court to insure that the standards of ethics remain high . . . . "

In *Norman Norell, Inc. v. Federated Department Stores*, 450 F.Supp. 127 (S.D.N.Y. 1978), the court disqualified the firm as trial counsel because one of the lawyers in the firm would be a witness, saying:

" . . . Manning states that he and his firm have been acting since 1974 without compensation in order to husband the assets of the Norell estate; that they will be compensated in this suit only if victorious; that to find other counsel experienced in dress business litigation to op-

pose on a contingent fee basis the 'powerful' defendant would 'probably be impossible'... Manning offers no support for the proposition that only counsel experienced in 'the dress business' would be competent to handle this litigation, nor has he stated why another firm could not be retained on a contingency basis. Moreover, the 'distinctive value' of the Manning firm to Norell would appear not to be as counsel but as witness, the very role barred by DR 5–102." *Id.* 130.

In *Supreme Beef Processors v. American Consumer Industries*, 441 F.Supp. 1064 (N.D.Texas 1977), the Court held that the language, "distinctive value of a lawyer or his firm as counsel in the particular case" generally contemplated only an attorney with some expertise in a specialized area of law, such as patents, and the burden is on the firm seeking to continue representation to prove distinctiveness. It held the rule is to be very narrowly construed.

"... This exception generally contemplates only an attorney who has some expertise in a specialized area of the law such as patents and the burden is on the firm seeking to continue representation to prove distinctiveness...." *Id.* 1068, 1069.

*Universal Athletic Sales v. American Gym, et al.*, 546 F.2d 530 (CA3 1976) was a case where an attorney testified as an expert witness in a patent case for a client of his law firm at the time the law firm was representing the client in the litigation. The Court disapproved of such a practice, holding that the law firm should have withdrawn once it decided its associate would testify as an expert witness.

"Ordinarily it is inappropriate for an attorney, or a lawyer in his firm, to testify on behalf of a client. Rules DR 5–101 and 102 of the Code of Professional Responsibility provide that a lawyer shall refuse employment or withdraw as counsel if the 'lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client...' Under such circumstances, the attorney, or his firm, must decide wheth-er to serve either as advocate or as a witness in a particular case. Recognizing that 'the role of an advocate and of a witness are inconsistent...', the code would appear to preclude the testimony of Mr. Lyle here. As the Disciplinary Rules logically apply to expert as well as lay witnesses, the law firm should have withdrawn once it decided that its associate would testify, or else the firm should have found another expert." *Id.* at 538

Some courts have implied that a long term involvement by an attorney in a particular case in and of itself would support a finding of distinctive value. See *Miller Electric Construction Company v. Devine Lighting*, 421 F.Supp. 1020 (W.D.Penn.1976) and *Greenebaum-Mountain Mortgage Company v. Pioneer National Title Insurance Company*, (supra). This Court does not feel that a long term involvement in a particular case necessarily supports such a finding. The necessity for an attorney to leave the case after long term involvement might be a hardship upon the client, but it is difficult to see that long term involvement as such would support a finding of distinctive value.

The American Bar Association's Committee on Ethics and Professional Responsibility has dealt with the fourth exception in Formal Opinion 339 of January 31, 1975. This opinion was adopted by the Ethics Committee of the Michigan State Bar in Informal Ethics Opinion CI–593 on December 22, 1980.

The Committee said (page 3):

"... Exceptional circumstances may arise when these disadvantages to the client would clearly be outweighed by the real hardship to the client of being compelled to retain other counsel in the particular case. For example, where a complex suit has been in preparation over a long period of time and a development which could not be anticipated makes the lawyer's testimony essential, it would be manifestly unfair to the client to be compelled to seek new trial counsel at substantial additional expense and perhaps to have to seek a delay of the trial. Simi-

larly, a long or extensive professional relationship with a client may have afforded a lawyer or a firm such an extraordinary familiarity with the client's affairs that the value to the client of representation by that lawyer or firm in a trial involving those matters would clearly outweigh the disadvantages of having the lawyer, or a lawyer in the firm, testify to some disputed and significant issue...

"Under the Code, the critical question is whether the distinctive and particular value to the client of that lawyer or that law firm as trial counsel in that particular case is so great that withdrawal would work a substantial personal and financial hardship upon the client..."

Plaintiffs claim that because of Jaffe, Snider's close familiarity with the previous litigation which gave rise to this case, the complexity of that litigation, the length of time the firm has been associated with the client, and the lack of financial resources of the client, the criteria of the fourth exception are met.

In support of this contention, plaintiffs have submitted an affidavit by Joseph L. Hardig, Jr., a former president of the State Bar of Michigan and a member of the American College of Trial Lawyers, who has had many years of experience trying protracted civil matters. Mr. Hardig says in his affidavit that it would take 247 hours for a competent lawyer to acquaint himself with the prior actions, and with the status of the present action.

Much of the time set forth in Mr. Hardig's affidavit would have to be spent by any attorney, including the Jaffe, Snider firm, in preparation for the trial of this matter. And, of course, much time would be saved if Jaffe, Snider were to stay in the case. But time is not controlling. The question is—would there be substantial hardship because of the distinctive value of the lawyer or his firm?

It could be argued that plaintiffs have made out a case of substantial hardship on the client because of the close relationship over the years between client and the attorney, the extra cost that would be associated with hiring a new attorney, and the limited financial resources of the client. However, the need for Mr. Garratt's testimony was obvious and the disqualification motion certainly should not have come as a surprise. This is not a case where some new, unanticipated twist in the lawsuit spawned a motion to disqualify. Counsel here must have known that such a motion would be forthcoming.

Even assuming that a showing of substantial hardship has been made, there nevertheless has been no showing of distinctive value. Detailed familiarity with the prior litigation does not create distinctive value. Distinctive value connotes more than merely a long-time association with a case. It requires more than is shown here.

Furthermore, the charged atmosphere requires disqualification in this instance. As pointed out earlier, emotions are running high between Jaffe, Snider and Hale & Dorr. Accusations of abuse of process and malicious prosecution against law firms are not lightly made, nor are they lightly defended. It is hard for the Court to conceive of a case where there will be more bitter feeling and more unpleasantness between attorneys than there will be in the trial of this matter.

In determining whether to disqualify a firm of attorneys under DR 5-102, the Court must look beyond the specific language of the rule to the nature of the lawsuit, the relationship between counsel, and the possibility of personal recriminations. After a consideration of these factors, it is clear that disqualification is necessary under DR 5-102. For the reasons stated, the fourth exception does not allow Jaffe, Snider to remain as counsel for plaintiffs.

Finally, lawyers must always avoid the appearance of impropriety. Canon 9 of the Code of Professional Responsibility states:

"A Lawyer Should Avoid Even the Appearance of Professional Impropriety"

Ethical Consideration 9-6 mandates that a lawyer conduct himself so as to reflect credit upon the legal profession, and to

inspire competence, respect and trust of the clients and public. It emphasizes that lawyers must strive to avoid not only professional impropriety but also the appearance of impropriety.

To allow Jaffe, Snider to remain as counsel for plaintiff would create an appearance of impropriety because of the nature of the case. This Court must conclude that not only must Mr. Garratt and Mr. Jaffe be disqualified, but also the entire Jaffe, Snider firm. The potential for prejudice to the plaintiffs, to the defendants, and to the entire trial process and public perception of the profession is simply too high under the circumstances of this case.

It was argued, in oral argument, that the Court should conduct a testimonial hearing upon this matter before ruling. No testimonial hearing is required or necessary. The facts developed by briefing and by affidavits and counter affidavits sufficiently spell out the difficulty here.