GENERAL MILL SUPPLY COMPANY, Manual Rotenberg and Milton Rotenberg, Plaintiffs-Appellants,

v.

SCA SERVICES, INC., Hale and Dorr, Defendants-Appellees.

No. 81–1352.

United States Court of Appeals, Sixth Circuit.

Argued July 28, 1982.

Decided Dec. 28, 1982.

Rehearing and Rehearing En Banc Denied March 14, 1983.

---

Jacob K. Stein, Paxton & Seasongood, Cincinnati, Ohio, Eddie M. Morris (argued), C. William Garratt (argued), Bloomfield Hills, Mich., for plaintiffs-appellants.

Richard C. Sanders (argued), Hill, Lewis, Adams, Goodrich & Tait, Robert S. Krause (argued), Detroit, Mich., for defendants-appellees.

Before ENGEL, KEITH and NICHOLS *, Circuit Judges.

NICHOLS, Circuit Judge.

■ This appeal requires us to review certain interlocutory orders by the United States District Court, Eastern District of Michigan, Southern Division, 505 F.Supp. 1093, which effected the disqualification of an individual attorney, C. William Garratt, Esquire, and his entire law firm, as it then was Jaffe, Snider, Raitt, Garratt & Heuer, from further representation of the plaintiffs in the trial of this action. While the case remains otherwise as yet untried, we have jurisdiction of the appeal even though interlocutory. *General Electric Co. v. Valeron Corp.,* 608 F.2d 265 (6th Cir.1979), *cert. denied,* 445 U.S. 930, 100 S.Ct. 1318, 63 L.Ed.2d 763 (1980). Mr. Garratt has recently left the above-named firm and we understand plaintiffs desire to be represented by Mr. Garratt and his present associates, one of whom, Mr. Morris, argued the appeal, with Mr. Garratt himself, by our express permission. The portion of the orders appealed from that disqualified Mr. Jaffe and other persons remaining in his firm is therefore moot and is not considered further. The district court on our remand will have to reconstruct its orders to deal with the new situation in light of the views we will express.

General Mill Supply Company (General Mill), a Michigan corporation, and its principals, the brothers Manual Rotenberg and Milton Rotenberg, are in the business of brokering certain grades of waste paper. SCA Services, Inc. (SCA) buys waste paper. In November 1973 General Mill contracted with SCA to broker the sale to paper mills of waste paper which SCA was to purchase from a retail grocery chain called Lucky Stores, Inc., (Lucky) under a long-term contract. SCA terminated its contract with Lucky and sued that company, which counterclaimed. SCA filed a third party complaint against General Mill, which also counterclaimed. This litigation was tried in the United States District Court in Illinois and is now disposed of, successfully for General Mill in part only, so far as concerns SCA versus General Mill. Hale & Dorr, a well-known Boston firm, represented SCA which apparently has headquarters in Boston. Mr. Garratt represented General Mill.

The later suit with which we are now concerned names General Mill plaintiff and Hale & Dorr as well as SCA, defendants. It was originally filed in January 1979 in the Circuit Court for the County of Wayne, Michigan. It is said a Hale & Dorr partner was served while at the University of Michigan interviewing students for recruitment into that firm. The suit later that year was removed on diversity of citizenship to the United States District Court. The essence of the claim in this new and present suit is that SCA and Hale & Dorr committed an abuse of process in suing General Mill, knowing that SCA had no case against General Mill, whatever the situation might be as regards Lucky, and that the motive was to force General Mill to give testimony favorable to SCA and adverse to Lucky, perjured testimony according to Mr. Garratt. It is alleged SCA or its counsel, Hale & Dorr, repeatedly offered to dismiss the suit if such testimony were forthcoming. The ultimate recovery by General Mill was $82,000, considerably under the counsel fees in the case, reducing General Mill to what is described as a negative net worth. Mr. Rotenberg says in his affidavit they expended over $250,000 in *attorney's fees* (!) alone in that action. There is nothing said about any assessment of counsel fees as costs in that case.

Hale & Dorr, as well as SCA, are represented by other counsel than Hale & Dorr in the district court and this court.

* Judge Nichols was an Associate Judge of the United States Court of Claims when this case was argued. He was sitting by designation. On October 1, 1982, he became a member of the newly created United States Court of Appeals for the Federal Circuit, with the title of Circuit Judge, by various provisions of Pub.L. No. 97–164, 96 Stat. 25.

Hale & Dorr moved to dismiss and for summary judgment. Mr. Garratt, in opposition, October 17, 1979, filed an affidavit by himself which is at the heart of this controversy, and the part immediately now pertinent reads as follows:

Defendants also attempted to coerce false testimony from Plaintiffs General Mill, Manuel [sic] Rotenberg and Milton Rotenberg in the prior action and to cause them to otherwise unlawfully and improperly assist Defendant SCA and Hale & Dorr in their litigation against Lucky. After Plaintiffs General Mill, Manuel [sic] Rotenberg and Milton Rotenberg had been served in the State of Michigan with a Summons and Third Party Complaint in the prior action, I had a long distance telephone conversation (between Michigan and Massachusetts) with James C. Donnelly, Jr. of Defendant Hale & Dorr, the substance of which follows. I told Mr. Donnelly that I could not understand why Defendants had sued my clients in the first place because my clients seemed to know facts that would hurt, not help, SCA in its litigation with Lucky. I asked Mr. Donnelly if anything could be done to dispose of the Third Party Complaint because my clients could not afford to be in the midst of complex, expensive litigation with two large corporations, Defendant SCA and Lucky. In response to Mr. Donnelly's inquiry, I told Mr. Donnelly that, according to my clients, the quality of most, if not all, of the paper that Lucky had furnished to SCA was satisfactory to my clients and the paper mills months before SCA terminated performance of its contract with Lucky. Mr. Donnelly said that SCA initially had no inclination to sue General Mill but that it had been done for strategic reasons. Mr. Donnelly said that they were really pushing the lawsuit against Lucky and the defense of Lucky's lawsuit against SCA, rather than the Third Party Complaint, and that they hoped that the Third Party Complaint would make General Mill join SCA to nip in the bud Lucky's claim against SCA and to blame Lucky for problems that arose during the course of the contract. Mr.

Donnelly said that they felt that SCA would not do as well in the litigation without the assistance of General Mill and the Rotenbergs. Mr. Donnelly said that the Third Party Complaint was not filed because they expected to recover money on it, because they did not, but because they needed favorable testimony from General Mill and the Rotenbergs to support SCA's claims. Mr. Donnelly said that they were not interested in proving General Mill liable to SCA and that they would not pursue recovery on the Third Party Complaint if General Mill and the Rotenbergs testified as Defendants wanted and if General Mill and the Rotenbergs used their influence with paper mills to secure from them testimony favorable to SCA about the quantity of bad quality Lucky paper. I concluded that SCA and Hale & Dorr were attempting to make my clients commit and suborn perjury and said that, while my clients could not afford the cost of litigation, I did not believe that they would lie or encourage others to lie in order to avoid litigation.

I had two other conversations with Defendant Hale & Dorr about the same subject, one with Mr. Donnelly in Illinois in early February, 1976 and the other with Jerome P. Facher in Massachusetts in late March, 1976.

The affidavit does not give the date of the conversation described, but the context suggests it was early in 1976.

It will be thought that the affidavit information must have been essential to avert a summary judgment, or else Mr. Garratt would not have divulged it. The affidavit itself shows that no one but the adversary counsel could testify to the conversation described, besides Mr. Garratt, and the likelihood the adversary would confirm Mr. Garratt's account could not be rated very high.

January 18, 1980, counsel for SCA and counsel for Hale & Dorr jointly moved to disqualify Mr. Garratt and his then firm from further participation in the case. They pointed out that by the affidavit, Mr.

Garratt was an essential witness in the case who ought to be called; without the evidence he would give, it would surely fail. They relied on the ABA Code of Professional Responsibility, DR 5–101(B), and DR 5–102(A) which read as follows:

(B) A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness, except that he may undertake the employment and he or a lawyer in his firm may testify:

(1) If the testimony will relate solely to an uncontested matter.

(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.

(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

DR 5–102

(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns, or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4).

Before us in oral argument Mr. Garratt maintained it was not essential to the case that he testify at all. He might make out a cause of action for abuse of process and malicious prosecution without any use of his own testimony, particularly since he did not read the counter-affidavits of Hale & Dorr principals as expressly contradicting the essential parts of his own. He might in depositions still to come obtain admissions by the principals that would make out his case, and he might also prove it by Hale & Dorr's general conduct of the former litigation. He could not, however, stipulate that if reinstated as counsel, he would not testify. We do not think it at all likely that any independent counsel for General Mill would feel safe in letting the case go to submission, without use of the material divulged in the affidavit; if Mr. Garratt really prosecuted the case in the manner or manners he asks us to believe in, his zeal for his client would fall under grave suspicion. Certainly the supposition of the district court that he was an essential witness is far indeed from being shown to be clearly erroneous.

There is in the record evidence to show the prejudice that would befall General Mill and the Rotenbergs if the disqualification is made to stick. Mr. Garratt says, and we take as true, that he is experienced and expert in the customs and law of the waste and scrap paper trade. Also, he has lived through the previous litigation from its inception and has in his memory, or at his finger tips, knowledge of the case no one else could duplicate. The complication of the former case is testified to, not only by the fees it generated, but also by affidavit of Richard S. Molcham, Esquire, who represented Lucky, and who also states that no one could successfully prosecute this case except Mr. Garratt or Bret S. Babcock, Esquire, of Peoria, Illinois, who was co-counsel in the Illinois case. Mr. Rotenberg, one of the plaintiffs, deposes that awareness that Mr. Garratt was available was essential to his decision to start the present action: that his services are of "distinctive value;" that General Mill would suffer "irreparable disadvantage and great hardship by disqualification;" that General Mill does not have the cash or other resources to employ another attorney. Joseph L. Hardig, Jr., Esquire, a practicing Michigan trial lawyer, says he estimates 247 hours of work (broken down in detail) for a new lawyer to become even with Mr. Garratt in readiness to try the case and this is not subject to offset for preparatory work Mr. Garratt would still

also have to do, but just for the new man to come even, if anyone ever could. We deal with the absence of an evidentiary hearing later; we note here that no district judge could with any consistency disbelieve this evidence or any of it, and still refuse to accord a hearing. We do not find express indication in the words of any such judge about the case that he or she did disbelieve any of this evidence.

Judge Patricia J. Boyle originally allowed the motion and disqualified both Mr. Garratt and his firm by "bench opinion." Later, having had called to her attention *Melamed v. ITT Continental Baking Company*, 534 F.2d 82 (6th Cir.1976), on a new appeal after evidentiary hearing, 592 F.2d 290 (6th Cir.1979), referred to by the parties and by us hereinafter as *Melamed* I and II, she decided that *Melamed* I did not require an evidentiary hearing because the issues and evidence were so different. There the issue was impropriety through counsel having formerly represented adverse interests. The district court decision was held to rely too much on the representations of counsel in their briefs, and on colloquies between court and counsel with only one affidavit. Here the facts were well developed. However, she learned from *Melamed* II added respect for the right of a party to select its own counsel when full disclosure of any possible conflict was shown to have been made. She thought her previous order had gone too far in disqualifying the firm and revoked that part of it, but reaffirmed the disqualification of Mr. Garratt personally.

The case afterwards passed to the courtroom of District Judge Horace W. Gilmore, who reconsidered the disqualification of the firm. He says that no one contested Mr. Garratt's disqualification. Besides the Code provision cited above, he considered Ethical Consideration 5–9 of the Code of Professional Responsibility which reads:

EC 5–9 Occasionally a lawyer is called upon to decide in a particular case whether he will be a witness or an advocate. If a lawyer is both counsel and witness, he becomes more easily impeachable for interest and thus may be a less effective witness. Conversely, the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility. The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the case of another, while that of a witness is to state facts objectively.

The reason for reconsideration was alleged to be newly discovered evidence that Jaffe, Snider had once done legal work for SCA and had been dropped as the result of a falling out. The opinion of Judge Gilmore is exhaustive, scholarly, and well reasoned, but is essentially mooted inasmuch as retention of Jaffe, Snider in the case is no longer desired. The main thrust of his decision is that Jaffe, Snider must be and is disqualified. We derive some insight from the opinion, however. There was also new evidence of the motives behind the disqualification motion in a memorandum between two lawyers at Hale & Dorr:

Jim, I do not want to lose a disqualification motion either as to Garratt or his firm. Please work with Krause and initiate suggestions and drafts, rather than wait for him. This is a crucial motion, *and if we win it the whole case will turn around.* [Emphasis supplied.]

This appeal followed and so did the separation of Mr. Garratt from his former firm which moots the appeal in part. The remaining issues not mooted and argued in this court are as follows: I, whether Judges Boyle and Gilmore erred in deciding to disqualify the attorney for a party without conducting a testimonial hearing; II, whether Judge Boyle erred in not according sufficient weight to the indispensible nature of the services Mr. Garratt had rendered and would render to plaintiffs in this case, as well as the hardship to plaintiffs his disqualification will cause; and III, even if a disqualification was proper, was it error not to limit it to the "trial" itself, leaving Mr. Garratt free to act in pretrial and post-

trial matters such as pretrial conferences, discovery, depositions, etc.? Whether Mr. Garratt's present partners, if any, and associates, may be disqualified will doubtless have to be decided, and nothing in the present record would warrant us in expressing any opinion with respect thereto. It remains for the trial court. We conclude that there was no reversible error with respect to any of the three issues we have to decide. Our reasons for this conclusion follow.

I

We do not think *Melamed* I, *supra,* can fairly be read to demand an evidentiary hearing on all disqualification motions. This court required one in the circumstances of that case, 534 F.2d at 84, 85:

> * * * The district court reached the conclusion that the motion to disqualify was not well taken, but apparently this conclusion was based upon briefs of counsel with one supporting affidavit filed with the movant's brief. It may be that the court also relied to some extent upon colloquies between the court and counsel. There is nothing in the record to indicate that an evidentiary hearing was held *or a factual inquiry made* * * *. [Emphasis supplied.]

The court then proceeded to direct an evidentiary hearing after a written response in that case, but the directive was not made general, to apply to all cases, and the implication of the part quoted is that a "factual inquiry" by some mode other than an evidentiary hearing will in some cases be sufficient. *Bohack Corporation v. Gulf & Western Industries, Inc.,* 607 F.2d 258 (2d Cir. 1979) so holds. It would be absurd to say a court can decide an entire case without an evidentiary hearing by summary judgment. Fed.R.Civ.P. 56, but must hold an evidentiary hearing before it decides an interlocutory subordinate issue. By Fed.R.Civ.P. 1 the rules are to be construed "to secure the just, speedy, and inexpensive determination of every action." When *Melamed* II, *supra,* came back, it was nearly 4 years from filing of the complaint and two and a half from

the prior appearance in this court. Save for the "full evidentiary hearing" on the disqualification motion, nothing but "limited discovery proceedings" had been even started towards disposition of the case. It was obvious the disqualification motion had proved its effectiveness to sidetrack the lawsuit without regard to the merits, whether so meant or not. The motion itself, if not frivolous, was not substantially founded. We concluded thenceforward not to entertain interlocutory appeals from denial of disqualification motions. Obviously, if our attention had been directed to it, we would have said an evidentiary hearing need not occur on every such motion. We say that now.

 We think a decision for disqualification is adequately founded without an evidentiary hearing if the "factual inquiry" is conducted in a manner that will allow of appellate reviews, as it is when conducted on affidavits and documents that would be acceptable under Rule 56(e)—a condition that had not been met in *Melamed* I—and if the district judge does not undertake to decide disputed issues of fact.

These standards are met here. Judge Boyle reviewed the record and determined it was adequate for appellate review within the meaning of *Melamed* I. The affidavit evidence is full and complete, and, except as noted, nothing was decided below on the basis of unsworn statements in briefs or bench colloquies with counsel. Counsel for defendants were allowed to state orally they meant to call Mr. Garratt as a witness. Counsel normally may state their intentions in that manner. In any case, justice would require calling him. Nor do we find that either district judge decided disputed issues of fact. Judge Gilmore may have misconstrued the Hardig affidavit, but if he did, it was in connection with an issue now mooted, the disqualification of Jaffe, Snider. He treated the disqualification of Mr. Garratt as a matter already decided. As we have stated, the procedure adopted requires us to regard Mr. Garratt's affidavit material as true, excepting ultimate conclusions, as long as they are plausible and consistent

in themselves, and not in conflict with recorded facts. It is impossible to show, therefore, any prejudice to Mr. Garratt; if there was any, it was to his adversary. The most disturbing factual material in the affidavits was as to Mr. Garratt's indispensibility to the client, and the injury to the client his disqualification would cause. In the nature of things, most of this material was in the peculiar knowledge of the appellants. The moving party, appellees, Hale & Dorr, offered and could have offered no opposing affidavits. If they had insisted on an evidentiary hearing to cross-examine the affiants, and on discovery of business records, it would have been hard to tell them no. But they are satisfied with and defend the proceedings below. It is impossible to say that the procedure adopted prejudiced Mr. Garratt.

Plaintiffs cite some decisions of other circuits to support the contention that an "evidentiary hearing" is mandatory. *Fullmer v. Harper,* 517 F.2d 20 (10th Cir.1975) involves a disqualification of counsel on a record inadequate for appellate review, as in *Melamed* I, *supra,* and a similar directive was issued in remanding to the district judge with, however, no statement that an evidentiary hearing was mandatory in all cases. *J.P. Foley & Co. v. Vanderbilt,* 523 F.2d 1357 (2d Cir.1975) was a remand for fact finding in a disqualification case, but the court did not specify how the fact finding was to be conducted. In *Kreda v. Rush,* 550 F.2d 888 (3d Cir.1977), the court remanded with directions to the district judge to state his reasons for disqualification. It said nothing about an evidentiary hearing. Here, instead of no reasons, we have statements by district judges providing almost a surplusage of reasons. Here the "evidentiary hearing" obviously would be a mudslinging match, bringing on many of the identical evils against which the disqualification order is directed. While this is not mentioned by them as a reason for their decision, we think it is a fact that we can consider in determining that the "evidentiary hearing" would have been a distasteful, even obnoxious procedure, besides being a waste of judicial resources and a prolonger of the litigation.

## II

We next conclude that there was no error or abuse of discretion in the decision to disqualify. In determining our standard of review, we note that Judge Boyle at first took the view she had discretion to some degree, at least, to disqualify when the ABA's Code did not expressly so require, if she thought it made inadequate provision to safeguard the integrity of the judicial process. There is some support for that view. *See* Gurfein, *Judge,* concurring, in *J.P. Foley & Co. v. Vanderbilt,* 539 F.2d at 1359. On the other hand, there have been expressions that where the facts are not in dispute, trial courts have no advantage over appellate courts in the application of "ethical norms." *Aetna Casualty and Surety Co. v. United States,* 570 F.2d 1197 (4th Cir. 1978), and cases cited. Because the manner of fact finding below compels us to suppress whatever doubts we may feel as to whether plaintiffs' case against disqualification gained illegitimately in the telling in plaintiffs' affidavits, we deem it appropriate to attack the ethical problem *de novo* rather than as review of a discretionary decision. What is required of us is a balancing of the interests involved, which are three—(a) the interest of the public in the proper safeguarding of the judicial process; (b) the interest of the defendants; and (c) the interest of the plaintiffs. Under the latter head comes not only the possible injury to plaintiffs if Mr. Garratt represents them, as urged by the opponent, but also the possible injury to plaintiffs if Mr. Garratt does not represent them, as urged by Mr. Garratt.

(a) *The public interest.* The district judges below rightly separated that consideration in their analysis from the interest of the parties. The parties might jointly desire a trial by ordeal or trial by battle, but the public interest would not allow this. The public interest demands a seemly and efficient use of judicial resources towards the just, speedy, and inexpensive remedy spoken for in Fed.R.Civ.P. 1. As Judge Boyle notes, the court should *sua sponte*

raise ethical problems involving danger to a just, speedy, and inexpensive remedy, even if the parties do not.

The experience of the bar and its collective voice in the ABA Canons demands the separation of the roles of advocate and witness. Experience shows that one who combines both roles is not likely to be, as an officer of the court, helpful to the court. There is always danger that when he speaks he will forget whether he speaks as advocate or counsel, to the likely confusion of proceedings, as well as their embitterment. Experience teaches that embitterment between counsel does not conduce to just and speedy proceedings. Such embitterment is likely to occur when one counsel undertakes to impeach the credibility of opposing counsel in his capacity of witness. Such attempt to impeach would necessarily occur in the suppositious "evidentiary hearing" and will occur in the ultimate jury trial of this case if Mr. Garratt conducts it. Judge Boyle regards this need to impeach as certain, and so do we. As Judge Boyle points out, an abuse of process suit involves always a prior action of some kind, and counsel in the prior action will always have more knowledge about it than anyone else and be the one most aggrieved by the supposed abuse, therefore the most indispensable witness in the new action. This is precisely, and in its most acute form, the situation to guard against which the canon was written.

But there is more to it than this. There is a wise maxim whose original author the writer does not know: "When you shoot at a king you must kill him." *Mutatis mutandis,* though we would not assign full royalty status to Hale & Dorr, Mr. Garratt in his affidavit in opposition to the motion for summary judgment was shooting at a king. He was making charges against Hale & Dorr that amounted to charging a crime, at least in the portion while he says he considered himself faced with an attempt to suborn perjury, which conclusion he disingenuously admitted in oral argument, no court would admit in evidence. (But *cf.* Fed.R.Civ.P. 56(e), which limits use of affidavit matter on summary judgment to statements which would be admissible in evidence in testimony by the affiant.) He was certainly charging conduct that, if believed, called for disciplinary action. It is unhealthy to shoot at a king and miss. Mr. Garratt cannot afford to miss. If he does, *i.e.,* if his charges are in the end disbelieved, his own standing is in the jeopardy he seeks to put Hale & Dorr in.

This is not just the situation for which the canon was written. It is that situation in spades, redoubled. If any witness ought not to be also advocate in a lawsuit, anyone whatsoever, it is Mr. Garratt in this case. If the canon allows him to be counsel and to testify, it serves no purpose and should be repealed.

In many suits this day and age the real subject of the litigation is standing and reputation. Forensic combat about standing and reputation is fiercer and more embittered, because people's reputation, and even unfounded charges against them, now follow them wherever they go. When the common law was developing, a person with a clouded reputation could travel a few hundred miles and start life afresh, cleansed of all stain by mere distance. Mr. Garratt is not only a witness and counsel. He is also in a realistic and not just a figurative sense, a party in interest as much as Hale & Dorr is, one whose standing and reputation is just as much at stake.

In these days of crowded dockets, settlement of civil suits, like plea bargains in criminal cases, are much desired by courts, which cannot force them. It is part of the duty an attorney owes the court to consider carefully all opportunities of settlement and report on them objectively to the client, with a fair and objective recommendation whether acceptance would be in the client's interest. This duty, an attorney in Mr. Garratt's situation, would have extraordinary difficulty in performing.

Courts likewise hope that counsel in civil cases will cooperate in discovery so it can proceed without day to day supervision by the court. They hope that counsel will stipulate all facts not in dispute, to the end that time will not be wasted proving such facts.

Hope for this from an attorney in Mr. Garratt's position would be a faint hope indeed.

(b) *Defendants' stake in the issue.* Here much is made of the wish expressed in an interoffice Hale & Dorr communication that—

> This [the disqualification motion] is a *crucial* motion and if we win it, the whole case will turn around.

Probably, as this suggests, Hale & Dorr hopes to gain a decisive advantage, one out of all proportion to its disadvantage that would inure from failure to win disqualification. Unfortunately, courts are largely dependent on attorneys for opposing parties to report unethical conduct. Otherwise they would never learn of it. But such reports are unlikely to be made if no "turn around" or just a minor benefit is expected. Thus, if we weigh the motive as *per se* adding a weighty reason against disqualification, we cut off information the court needs. Fortunately the canon authorizes us to consider injury to the client of the attorney to be disqualified, and this more or less subsumes the interest of the moving party to inflict injury, as a distinct issue. We can assume, if the grant of the motion is sustained, Hale & Dorr will benefit, perhaps be relieved of liability altogether. But this could occur if, *e.g.,* an indispensable attorney were disbarred for misconduct in a wholly unrelated matter. The grievance committee would not be deterred from seeking disbarment if the facts warranted because the erring attorney were indispensable to some client. And so here.

There may be some merit to the idea that Hale & Dorr's counsel will be handicapped in cross-examining and impeaching Mr. Garratt as a witness by the fact he is, if he is allowed to be, also an advocate in the case. *See* Ethical Consideration 5–9. Judge Gilmore quotes *International Electronics Corporation v. Flanzer,* 527 F.2d 1288, 1294 (2d Cir.1975). They might, they say, prejudice the jury against them. It does not seem this could be a major factor. Juries are not as stupid as it pleases some people to believe, and it may be that a clever cross-examiner could turn Mr. Gar-

ratt's confusion of roles, if he is allowed to continue it, into prejudice against him, not in his favor.

On the whole, we conclude that as compared to the interests of the other party, presently to be discussed, and the public interest, the interest of Hale & Dorr includes little that justifies notice, or has weight for or against allowance of the motion.

(c) *We now turn to the interests of the plaintiffs.* The canon allows an attorney to accept employment if—

> (4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

This hardship is the most difficult issue to be dealt with since the affidavit material we must take as true so strongly supports its reality. Judge Boyle thought that the hardship meant not just any hardship, but one resulting from "distinctive value" and that in turn meant something other than mere added cost due to a new counsel having to take time to learn the facts of the case the disqualified predecessor already knew. She thought, too, that Mr. Garratt could and would in his own self interest remain in close association with preparation of the case and use his knowledge of the former case to help new counsel. This idea cannot be pushed very far without challenging the credibility of the Hardig affidavit, which neither she nor we are in a position to do.

■ We think, however, that the hardship situation covered by subparagraph (4) is one where the lawyer-client team come unexpectedly upon a disqualification situation, against which they neither actually did nor could have safeguarded themselves. We do not think it was meant for a case where a possible disqualification dilemma was visible years before it arose, yet the parties went right on increasing the helpless dependence of client upon lawyer. The ancient maxim of the law, *volenti non fit ujuria* applies. A self-inflicted injury is not a hardship.

■ We note that SCA had brought General Mill into the previous Illinois suit as third party defendant in early 1976. General Mill counterclaimed. SCA introduced no evidence to support its claims on General Mill and recovered nothing against General Mill. General Mill recovered $82,000, affirmed by the United States Court of Appeals for the Seventh Circuit, May 18, 1979, in an unpublished order. General Mill incurred in that suit a cost of $250,000 in counsel fees, and now have a negative net worth. It was in that suit that Mr. Garratt obtained the special knowledge so indispensable to General Mill. Whether any of the $250,000 is owed but unpaid is not stated, nor to what attorney. It is an intriguing but unverified possibility that much of it is unpaid and owing to Mr. Garratt. Mr. Garratt was not sole counsel; he had co-counsel, Mr. Babcock, a Peoria, Illinois, lawyer, and part of the $250,000 may have been paid or owed to him. This account is very incomplete and doubtless will be the subject of much inquiry, which has not yet occurred, in the present suit.

The Garratt affidavit of October 17, 1979, was filed in opposition to the motion of SCA and Hale & Dorr for summary judgment. The telephone conversation with Mr. Donnelly of Hale & Dorr described in the excerpt already quoted, which we must take as true, seems to have occurred in February 1976. Its date is not fixed in the affidavit, as it should have been, but its context indicates it preceded another one referred to later, dated February 1976. It seems to have followed after and resulted from the service of process upon the Rotenbergs. Mr. Garratt knew from this conversation that—

> * * * The third party complaint was not filed because they [Hale & Dorr] expected to recover money on it, because they did not, but because they needed favorable testimony * * *. Mr. Donnelly said they were not interested in proving General Mill liable to SCA * * *.

Mr. Garratt himself knew of no evidence to prove his clients liable to SCA and if after the telephone conversation he had any doubt if there existed any, he could have explored the matter in pretrial and discovery. The conclusion seems inescapable, therefore, that General Mill was in no anxiety about its own liability. By far the largest part of the $250,000, surely, and possibly all of it, was spent or incurred offensively, to establish a liability against SCA. The Seventh Circuit states that about $900,000 was claimed. Had this been recovered, we would have no problem, but the recovery was only $82,000, a disappointing fruit, surely, of the investment made.

The telephone conversation, if proved, establishes a perfect case of abuse of process, especially if Mr. Garratt's conclusion from it is also accepted. Mr. Garratt therefore knew from early 1976 that down the road, after he could get the Illinois suit disposed of, there would or might be an abuse of process suit in which he would be an indispensable witness. The canon of ethics was in effect, and both he and the client knew, or should have known, that it would require him to withdraw. Yet they continued by their joint actions to enlarge the described condition of helpless dependence, Mr. Garratt having the files and the know-how on which the abuse of process case would depend. Now they turn to the United States District Court and say in effect: "Yes, judge, we know that the canons would never allow Mr. Garratt to represent General Mill in an abuse of process suit, and also be its star witness. But you can't do anything to us, because, knowing what was down the road, by our own deliberate action we created a situation where Mr. Garratt is indispensable to General Mill and his withdrawal a hardship. So, judge, you'll just have to swallow it."

But, according to the ABA's n. 13 to Canon 5, quoting a state case, the duty to withdraw is plainest when the need to be a witness was known well in advance. The canon would be absurd and indefensible if it excused compliance when the dependence of the client on the lawyer had been created in face of the knowledge that the dependence would be used to frustrate the enforcement of the canon. The term "hardship" is certainly capable of rational interpretation, of

meaning a situation the alleged victim of the hardship has not knowingly caused and could not reasonably foresee. Should it have the meaning attached to it in the above imaginary colloquy, courts would not follow it but would proceed as Judge Gurfein suggests, *supra.* Had the negative net worth been created and the $250,000 paid or incurred in defending a suit forced on General Mill in an abuse of process, not offensively in a counterclaim, we would have a case more like the one the hardship exception was meant to correct.

It is not for us to say what proper respect for the involved ethical rule would have required plaintiffs to do. Probably they had originally many options. One of them would have to expend the liberal $250,000 committed to the counterclaim in such a fashion that when the money was gone, Mr. Garratt was not left to be both the indispensable attorney and the necessary witness in the remaining and ultimate phase of the General Mill versus SCA litigation. We know of the existence of one collaborator, Mr. Babcock, who shares the knowledge generated by conduct of the earlier phase, and why he is not available is not explained.

We have also considered the doubtless high minded arguments on behalf of defendants, that plaintiffs will suffer injury from employing Mr. Garratt in both capacities. Though this is speculative, it may well be true, but *Melamed* II, *supra,* teaches us that the client, if of full age, *sui juris,* sophisticated, and instructed as to the ethical problems involved, has the full right to waive whatever objections he might voice. The Rotenberg brothers, by their affidavits, have executed such a waiver, and we do not think further consideration of the point by us is required.

Summarizing our conclusions, they are that the public interest in the proper safeguarding of judicial business strongly commands disqualification, that the alleged hardship to plaintiffs is not of overcoming weight in light of the circumstances in which it was incurred, and that a weighing of the other benefits and injuries to befall the parties by a decision to disqualify or not

to disqualify, fails to reveal any that will tip the scales. Accordingly, the disqualification must be sustained.

### III

The third major question before us is whether the disqualification extends to all phases of the litigation or only to the actual trial. Judge Gilmore made it clear he extended it to the entire case, but, according to plaintiffs, he noticed belatedly, and never gave proper effect to, the actual language of the canon involved.

DR 5–101(B) speaks to the decision of a lawyer to accept employment in "contemplated or pending litigation, then knowing he may be called as a witness." DR 5–102(A) deals with the case of an attorney who has already accepted employment and thereafter learns that he "ought to be called as a witness on behalf of his client." It is only DR 5–102(A) that speaks in terms of withdrawing "from the conduct of the trial." The text of these canons appear in our statement of the case. If there is, as plaintiffs' argument implies, a difference in the degree of disqualification, it becomes relevant whether Mr. Garratt learned of the cause of his disqualification before or after he accepted employment. We know by his October 17, 1979 affidavit that he was in possession of all the facts as to his essentiality as a witness in February 1976. We do not think he can be heard at this late date to argue he accepted employment before February 1976 and therefore DR 5–101(B) and not 5–102(A) is the one that governs. In case there should be any doubt, however, we are also of the opinion that the word "trial" in the latter could not have been meant in the limited sense plaintiffs attribute to it. The ABA says, EC 5–10—

Regardless of when the problem arises, his decision is to be governed by the same basic considerations.

By Webster's Unabridged a "trial" is: * * * 2. The formal examination of the matter in issue in a cause before a competent tribunal for the purpose of determining such issue: the mode of determining

a question of fact in a court of law * * *.
b. All proceedings from the time the parties are called to try their cases in court or from the time when issue is joined to the time of final determination.

It is therefore unlikely the ABA intended that a lawyer could retain control of everything but the literal "trial" before the jury merely by shielding himself from awareness that he would be a necessary witness until after he was retained.

■ In *Norman Norell, Inc. v. Federated Department Stores, Inc.*, 450 F.Supp. 127 (S.D.N.Y.1978), Judge Tenney barred a lawyer-executive from representing himself, when also a necessary witness, under circumstances strongly appealing for a contrary rule, but limited the bar to the actual trial only. He referred to the suggestion by Judge Gurfein, *supra,* that federal judges were not required to apply the ABA Canons literally as if they were statutes, noted the fact that the position of the lawyer much resembled that of a party appearing *pro se,* and analyzed the interests involved, showing that this limited disqualification better protected the various interests he had to balance. We regard this disposition as within the sound discretion of a trial judge, but note that Judge Boyle regarded the discovery deposition by Mr. Garratt of Mr. Donnelly of Hale & Dorr, the other party to the famed telephone conversation, with more horror, if possible, than she did his participation in the public trial. We assume arguendo that Judges Boyle and Gilmore, having decided to disqualify, had discretion to determine to what proceedings the disqualification would apply. We think they were far from abusing their discretion in this instance in applying it to the whole case.

Under the Fed.R.Civ.P. the ultimate "trial" is connected as a seamless web to the ascertainment of issues at the pretrial proceedings, and particularly to the discovery depositions. Not even the possible confusion of the jury would be averted by exclusion from the "trial" only. The jury would very likely hear depositions, or excerpts from them read, in which Mr. Garratt fig-

ured. Here the actual conduct of a prior case is the subject of the lawsuit. The most acute evils we would foresee from failure to enforce the canon in this instance would occur in the pretrial period, the one in which the most time and money is consumed in civil cases.

There is, however, nothing in the orders appealed from barring Mr. Garratt from rendering the large assistance that is in his power to new trial counsel. We think our decision should be "law of the case" until the fact finding function is performed by jury verdict or findings of the court after a bench trial. A revised order will meanwhile be necessary to deal with the participation in the trial of Mr. Garratt's present partners or associates, if the client desires their participation. We have had no evidence or argument before us on this and, therefore, express no opinion.

Accordingly, the decisions below are affirmed with the exception noted, and the cause is remanded for further proceedings consistent with this opinion.

ENGEL, Circuit Judge, concurring in part and dissenting in part.

Were I not convinced that Mr. Garratt should have foreseen that he would be called as a witness very shortly after the 1976 telephone conversation, I believe I might have voted to reverse the District Court outright on the basis that a convincing case of substantial hardship has been made out, bringing the case within the exception of DR 5–101(B)(4). I agree with the majority, however, that under the circumstances Mr. Garratt should be precluded from participating in the activities at trial.

I disagree with that part of the majority opinion which appears, albeit ambiguously, to preclude Mr. Garratt from participating in phases of the litigation other than the trial itself. Judge Gilmore recognized that disqualification motions require a balancing of "the potential prejudice to the parties, the profession, or the judicial process so as to apply DR 5–101 and 5–102 within the limits of their underlying rationales." *General Mill Supply Co., et al. v. SCA Services,*

*et al.,* C79–73053, mem. op. at 9 (E.D.Mich. January 28, 1981). The policies for application of the rules were considered by the Second Circuit in *International Electronics Corp. v. Flanzer,* 527 F.2d 1288, 1294 (2d Cir.1975):

> The ultimate justification for the disqualification rule, in [Professor] Wigmore's view, was that the public might think that the lawyer is distorting the truth for the sake of his client. Another argument for disqualification is that the lawyer-witness will vouch for his own credibility in summing up to the jury—a powerful means of support for his own credibility. The argument that such tactic is to the detriment of his client obviously defeats itself. But the argument that it is unfair to the opponent has some merit. It is difficult, indeed, to cross-examine a witness who is also an adversary *counsel* concerning matters of fact, and more particularly, on matters impeaching his credibility, within the bounds of propriety and courtesy owed to professional colleagues.

(emphasis added). *Accord,* ABA Comm. on Ethics and Professional Responsibility, Formal Op. No. 339 (1975).

I conclude that Judge Boyle's last decision, insofar as it dealt with pretrial activities, was a most sensitive and practical solution to a very difficult problem for Mr. Garratt's client.[1] Because Mr. Garratt would not be acting as an advocate during the trial, he would not be placed in a position of arguing his credibility in his summation to a jury. Opposing counsel would be free to cross-examine him vigorously and the jury evaluation of whether Garratt was distorting the truth would be no different from their consideration of the veracity of any witness. As Judge Boyle indicated in her opinion, the trial judge retains the power to regulate discovery to minimize Mr. Garratt's overt involvement in the case.

It is implicit in the employment of a balancing test that disposition of disqualification motions is a matter of judicial discretion. While the client's consent to representation by an attorney who will be a witness certainly cannot act as a per se bar to disqualification, the client's judgment concerning who will most vigorously represent his interests must normally be given great deference in a judicial system of truth-finding based upon advocacy. Judge Boyle's resolution of the dilemma, in my opinion, best respects these rights without doing violence to the rule. *Accord, Norell v. Federated Dept. Stores Inc.,* 450 F.Supp. 127, 130–31 (S.D.N.Y.1978).

With respect to whether an evidentiary hearing is required, I concur in the majority's holding that it is not. The record has been satisfactorily developed for a decision as it now stands. I agree that *Melamed's* requirements in that regard have been adequately met. I do not read *Melamed I* as invariably requiring a full-blown evidentiary hearing. Finally, I do not share the majority's apprehension that any further hearing would be a "mudslinging" contest, and certainly that factor should not have any bearing on whether such a hearing should or should not be held. The attorneys remain at all times bound in their conduct to the rules of professional conduct and can be expected to abide by them. The trial

---

1. While the issue of disqualification of Mr. Garratt's present firm is not before us in this appeal, it is interesting to note that Judge Boyle would also have permitted participation by Mr. Garratt's partners in the trial. The proposed Model Rules of Professional Conduct adopt a similar approach. Rule 3.7(b) provides:

 A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 [conflict between clients or with lawyer's own interest] or Rule 1.9 [conflict between present client and past client].

ABA Model Rules of Professional Conduct (1982). Another change is included in rule 3.7(a)(3), which allows an attorney to remain as trial counsel where there is a substantial hardship even without a showing of "distinctive value," which is a requirement of DR 5–101(B)(4).

While not as yet adopted, the proposed rules offer some important guidance as to how courts may handle such issues in the future. The changes in rule 3.7 appear, in my opinion at least, to be consistent with a greater recognition of the importance of the client's own judgment concerning his choice of counsel to represent him.

judge is exceptionally seasoned, and I have complete confidence in his ability to maintain an orderly court in all events. I also find myself unable to join the majority opinion in its characterization of the respective reputations of the law firms or lawyers involved in this dispute nor in any language which can be construed to comment on the underlying merits of the lawsuit itself.