BANQUE ARABE ET INTERNATIO-
NALE D'INVESTISSEMENT, et
al., Plaintiffs,

v.

AMERITRUST CORPORATION, et
al., Defendants.

No. C–1–85–1905.

United States District Court,
S.D. Ohio, W.D.

April 29, 1988.

James R. Bridgeland, Jr., G. Jack Donson, Jeffrey S. Schloemer, Cincinnati, Ohio, for plaintiffs.

David S. Cupps, Vorys, Sater, Seymour & Pease, Columbus, Ohio, Leo J. Breslin, Cincinnati, Ohio, for defendants.

## ORDER

HERMAN J. WEBER, District Judge.

This matter is before the Court upon defendants' Motion to Disqualify the law firm of Taft, Stettinius & Hollister ("Taft") (doc. no. 21). The Motion is based on DR 5–102(A) and (B) of the Ohio Code of Professional Responsibility which has been adopted by this Court as its Code of Professional Responsibility. See S.D. Ohio R. 2.6 and District–Wide Order 81–1, adopting the Model Federal Rules of Disciplinary Enforcement, Rule IV. Defendants request an Order disqualifying James R. Bridgeland, Jr. and the Taft firm from acting as trial counsel in this case. The basis of the Motion is that James R. Bridgeland, Jr., a partner in the Taft firm, will or ought to be called as a witness for the purpose of offering substantial evidence to contested matters in this litigation.

The Court has held discussions on the issues involved in the requested disqualification in several conferences and all parties were formally heard on the Motion. Subsequent to that evidentiary hearing, the parties filed their memoranda in support of their positions and submitted their proposed Findings of Fact and Conclusions of Law (doc. nos. 45 and 46). The Court has reviewed and considered the above-referenced material, including the various depositions, exhibits and transcripts filed and made a part of this record.

Based upon the foregoing, the Court makes only the following findings of fact relevant to this issue and conclusions of controlling law which are necessary to resolve the issue of whether James R. Bridgeland, Jr. and the law firm of Taft, Stettinius & Hollister should be disqualified from representing plaintiffs in this case:

### Findings of Fact

1) Plaintiffs in this action are Banque Arabe Et Internationale D'Investissement ("Banque Arabe"); Citizens Fidelity Bank & Trust Company; The Fifth Third Bank; The First National Bank of Cincinnati; The First National Bank of Louisville ("First Louisville"); and Herrlinger Trust.

2) Defendants are Ameritrust Corporation ("AmeriTrust"), a national bank and A.T. Western Corporation ("A.T. Western"), its wholly-owned subsidiary.

3) Plaintiffs' Complaint in this case includes claims alleging: 1) violations of federal securities laws, specifically § 12(2) of the Securities Act of 1933, 15 U.S.C. § 771 and § 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j and Rule 10b–5 promulgated thereunder; 2) common law fraud; 3) breach of contract; and 4) breach of guarantee.

4) Plaintiffs' securities fraud claims are based upon both alleged commissions and

omissions. The Complaint alleges that the tables and computer printouts which AmeriTrust distributed to debenture holders constituted material misrepresentations of fact in the form of projections of Central Bancorporation, Inc.'s ("CBI") future income upon which plaintiffs relied in deciding to purchase certain contingent certificates issued by A.T. Western.

5) Plaintiffs also allege that defendants failed to disclose the sale and leaseback transaction entered into by CBI in December, 1984 and that this constitutes an omission of a material fact in violation of the securities laws.

6) Plaintiffs' common law fraud claim is based upon the same allegations as their securities fraud claims.

7) Plaintiffs' breach of contract and breach of guarantee claims are based upon the allegation that plaintiffs have not been paid "an amount equal to the share of CBI's consolidated net income for 1984 to which plaintiffs are entitled under the terms of the Contingent Certificates."

8) This lawsuit arises out of a transaction which was one facet of the reorganization proceedings of Balwin–United Corporation ("Balwin–United"). At the time of the initiation of those proceedings in September of 1983, plaintiffs were holders of certain debentures/joint notes ("Debentures") issued by Balwin–United and its wholly-owned subsidiary D.H. Baldwin Company ("D.H. Baldwin"). Plaintiffs had acquired the debentures earlier in 1983 in exchange for certain Series B–2 Debentures issued by Baldwin–United which they owned at that time.

9) AmeriTrust held an interest in Baldwin–United debentures by virtue of a security arrangement with one of its debtors.

10) At the time of the reorganization proceedings, D.H. Baldwin held a Class II limited partnership interest in Central Colorado Company ("CCC"), which in turn held approximately 95% of the stock in CBI. CBI is a bank holding company in Colorado. This Class II limited partnership interest was the subject of the transaction which is the basis of the present litigation.

11) In connection with the Baldwin reorganization proceedings, plaintiffs, together with other debenture holders, filed an action seeking to return to their prior status as B–2 debenture holders, *Fifth Third Bank, et al. v. The First National Bank of Chicago*, Adv. No. 1–83–0600, in the United States Bankruptcy Court for the Southern District of Ohio.

12) Early in the reorganization proceedings, a dispute arose over Baldwin's entitlement to the dividends being paid by CBI to CCC. The First National Bank of Chicago, as indenture trustee for the debenture holders, asserted a claim to the dividends because the debenture holders felt that they had some form of security interest or ownership interest in CBI. The debenture holders, including plaintiffs, intervened to assert a claim which was consistent with their efforts to regain debenture holder status. These claims were eventually all released as part of the transaction described herein.

13) To effect a purchase of the equity interest claimed by Baldwin in CBI, defendants sought to purchase the debentures held by plaintiffs and others.

14) To promote their proposal for purchase of the debentures, employees and representatives of defendants contacted debenture holders, including plaintiffs, on numerous occasions from April 1984 to November 1984.

15) Defendants' proposal, from the time it was initially presented by defendants to plaintiffs until the proposed transaction (the "Exchange") closed in November 1984, remained in the general form of plaintiffs' surrendering their debentures to defendants in exchange for defendants' paying to plaintiffs an initial fixed cash amount plus securities (eventually termed "Contingent Certificates"), the return on which would be tied to the earnings of CBI.

16) Defendants initially described the Exchange to plaintiffs and other debenture holders at a group meeting held in Cincinnati on April 17, 1984. The concepts were outlined in a paper entitled "Colorado Bank Discussion Draft." E. William Haffke, Jr. and C. Robert Green distributed the discus-

sion draft and made a verbal presentation explaining the concept AmeriTrust had developed.

17) There were at least 14 persons present at the April 17, 1984 meeting, including not only Bridgeland, but also Paul Como of plaintiff First National Bank of Louisville and Al Lord of plaintiff First National Bank of Cincinnati, Norma Skoog, Greg Wilson, Donald Delaport, Don Wuebbling, Tim Hurley, William Sinkula, Hall Webb, William Ledwin, Irving Harris and defendants' representatives Green and Haffke.

18) On May 3, 1984, defendants' employees Green and Gregory Krontiris met in Cincinnati with Gary Sieveking and Como of plaintiff First Louisville and Bridgeland and Hurley.

19) During the May 3, 1984 group meeting, discussions were held regarding Denver parking lot property owned by CBI and, in particular, inclusion of gain from the sale of such property in CBI's earnings serving as the basis for payments to which plaintiffs and other debenture holders would be entitled on the securities to be issued by defendants.

20) Defendants' employee Green then had telephone conversations on May 9 and May 11, 1984 with Sieveking and Como of plaintiff First Louisville. During these telephone conversations, Green recalls discussing matters relating to inclusion of CBI's undervalued assets in the definition of CBI's earnings utilized for payments on the securities to be issued by defendants.

21) The testimony Bridgeland could offer regarding discussions of inclusion of gain from sale of the Denver parking lot in the calculation of CBI's earnings would be cumulative of testimony available from others, including Como, Sieveking and other representatives of plaintiffs who attended meetings with defendants at which this subject was discussed.

22) To the extent that Green claims that he had a private discussion with Bridgeland on May 3, 1984, which Bridgeland denies, Green admitted that such discussion was cumulative of the discussion with the larger group on that same date.

23) On May 15, 1984, another group meeting was held in Cincinnati at which defendants again presented their proposal for the Exchange. AmeriTrust distributed a document which outlined essentially the same terms as the April 17 Discussion Draft entitled "Proposal for Debenture Holders and Warrant Holders re: Central Colorado Company" and made another verbal presentation. Mr. Haffke also advised the group of progress made toward getting approvals from other necessary parties.

24) Also at this meeting, Mr. Harris and plaintiffs Banque Arabe and First Louisville each presented their own proposals. A general discussion session followed the presentation of the various proposals. As many as 45 persons attended the May 15, 1984 meeting, including not only Bridgeland, but also Como of plaintiff First Louisville, David Haas of plaintiff Firth Third Bank, Al Lord of plaintiff First National Bank of Cincinnati, Charles Wendell of plaintiff Banque Arabe, William Sinkula, Norma Skoog, Rick Martsen, Irving Harris, George Strike and defendants' employees and representatives Green, Haffke, Krontiris and William Coquillette. Any number of these persons, besides Bridgeland, can testify to the events of the May 15, 1984 meeting.

25) The next meeting of debenture holders was held in Cincinnati on May 25, 1984. Plaintiff Banque Arabe again presented its proposal to the group, but the proposal had not been reduced to written form.

26) Attending the May 25th meeting were many of those who attended the May 15th meeting. Among those who attended were at least Lord of plaintiff First National Bank of Cincinnati, Como and/or Sieveking of plaintiff First Louisville, John Oakes of plaintiff Banque Arabe, Mike Miller, Rick Martsen, Tim Hurley, Bridgeland and, on behalf of defendants, Green, Haffke and Coquillette. Any number of these persons, besides Bridgeland, can testify to the events of the May 25, 1984 meeting.

27) During June and early July of 1984, AmeriTrust negotiated and entered into agreements with CBI management, Bald-

win and certain security holders. Discussions with the staff of the Federal Reserve Board had also progressed to the point that AmeriTrust filed a formal application with the Federal Reserve Board seeking its approval of the transaction.

28) AmeriTrust's next contact with the debenture holders generally was in a letter dated June 12, 1984 which identified several changes in the terms of the proposal.

29) Defendants again presented their proposal to debenture holders at a group meeting held in Cincinnati on July 16, 1984. Attending this meeting was a large group of people, among which were not only Bridgeland, but also numerous representatives of debenture holders including plaintiffs and other parties, specifically, at least Como and/or Sieveking on behalf of plaintiff First Louisville, and Green, Haffke and Coquillette representing defendants. Any number of these persons, besides Bridgeland, can testify to the events of the July 16, 1984 meeting.

30) At the July 16, 1984 group meeting, defendants reviewed, and discussions centered on, the contents of a document prepared by defendants and provided by them to those present, which included defendants' proposed definition of consolidated net income and projections presented as to CBI's future earnings and the payments to be received by holders of Contingent Certificates.

31) On July 18, 1984 Haffke, Coquillette, Brian Bodager of defendant AmeriTrust, Doug Krause, Bridgeland and representatives of Ernst & Whinney participated in a telephone conference. Discussions during this telephone conference centered on the wording of the definition of consolidated net income to be employed in the Contingent Certificate Agreement.

32) Among the July 18, 1984 telephone conference discussions were matters relating to exclusion of gain from the sale of the Denver parking lot from CBI's consolidated net income. The express terms of the Contingent Certificate Agreement and its definition of CBI's consolidated net income exclude gain from a sale of the Denver parking lot from consolidated net income.

33) Any testimony Bridgeland could offer regarding the relation of the Denver parking lot to the definition of CBI's consolidated net income would be cumulative of that which numerous officers of plaintiffs could recount from the many group discussions had with defendants on the subject.

34) On July 20, 1984, defendants made an extensive mailing to debenture holders consisting of documents anticipated to be executed in effectuating the Exchange and other information relating to the Exchange.

35) The offering documents included: a set of disclosure materials regarding AmeriTrust and CBI; a Letter of Transmittal for use by the debenture holders in accepting the offer to purchase or granting proxies; and a form of Contingent Certificate together with a Contingent Certificate Agreement which included a definition of "Consolidated Net Income of CBI" revised to reflect the changes which were made.

36) On August 3, 1984, Green met in Cincinnati with not only Bridgeland, but also with Lord of plaintiff First National Bank of Cincinnati, Como of plaintiff First Louisville and officers of other plaintiffs. During this group meeting, matters were discussed relating to a minimum guarantee by defendants of the payments to be made on the Contingent Certificates.

37) The subject of a guarantee of minimum payments from defendants had been discussed between plaintiffs and defendants from the initial stages of their communications, including from at least as early as May, 1984 when Sieveking and Como of plaintiff First Louisville requested such a guarantee during a private telephone conversation with Green and when Sieveking, Bridgeland, Hurley and Lord of plaintiff First National Bank of Cincinnati met with Green and made such a request.

38) From at least as early as May, 1984, during discussions to which Bridgeland either was not a party on behalf of plaintiffs or at which he was only one of a number of representatives of plaintiffs, defendants

took the position that they would not guarantee minimum payments.

39) Testimony Bridgeland could offer on plaintiffs' requests for guarantees and defendants' denials of such requests is cumulative to that which can be offered by many officers of plaintiffs.

40) On or about August 13, 1984, following plaintiffs' receipt of the Offering Documents, Bridgeland and Coquillette had a private telephone conversation concerning certain portions of the Memorandum and the related Transmittal Letter about which Bridgeland had questions or concerns.

41) During this conversation, Coquillette made reference to the projections, assumptions and calculations which had been distributed to the debenture holders in the April 17 and May 15, 1984 documents and the June 12, 1984 letter, although they were not included in or made a part of the Offering Documents.

42) Coquillette testified that before commencing this illustrative calculation, he wanted to be sure that it was understood that both these numbers and the projections previously presented by AmeriTrust were presented solely for illustrative purposes and not as an effort to place a value on the offer, and that he went through a lengthy disclaimer or cautionary statement telling Bridgeland that: (i) the numbers being used were not intended to place a value on the offer to purchase or the securities being purchased; and (ii) plaintiffs were not to rely upon the calculations and assumptions, but instead were to independently value the offer and the securities.

43) Bridgeland testified that Coquillette did tell him that it was plaintiffs' responsibility to make their own independent appraisal of the value of the Contingent Certificates, however, Bridgeland also testified that Coquillette did not make any cautionary statement of disclaimer during this conversation.

44) There is no need for Bridgeland to testify as to this August 13, 1984 telephone conversation, because plaintiffs do not deny that defendants sought to make certain disclaimers of projections and the disclaimer in this instance relates to illustrative figures Coquillette chose to use in that telephone conversation and not to the written projections distributed by defendants on several occasions from April through July 1984.

45) In response to defendants' proposal for the Exchange outlined in the July 20, 1984 mailing to debenture holders, plaintiffs on or about August 20, 1984 submitted tender documents (their modified Transmittal Letters and their securities) to defendants which did not conform to defendants' proposal.

46) Defendants did not accept the tender made by plaintiffs on August 20, 1984.

47) Plaintiffs and defendants negotiated changes to their transaction, as documented by correspondence between the parties dated through November, 1984. At some point prior to the closing on November 12, 1984, the issues raised by plaintiffs Transmittal Letters were resolved.

48) As a result of negotiations between plaintiffs and defendants, plaintiffs again submitted tender documents to defendants in November, 1984.

49) Defendants accepted the terms of plaintiffs' November, 1984 tender and the Exchange closed on November 12, 1984.

50) Gary W. Sieveking, Vice President of plaintiff First National Bank of Louisville has been authorized by all plaintiffs to indicate to the Court whether plaintiffs will call Mr. Bridgeland as a witness.

51) Mr. Sieveking has reviewed defendants' Motion to Disqualify Taft, the memorandum of defendants and Affidavits of C. Robert Green, E. William Haffke, Jr., and William H. Coquillette in support thereof, the transcript of Mr. Bridgeland's March 1987 deposition and other discovery materials.

52) Leon G.R. Spoliansky is employed as General Counsel of plaintiff Banque Arabe et Internationale D'Investissement and has reviewed defendants' Motion, the Memorandum and Affidavits filed in support thereof, and other discovery materials.

53) None of the plaintiffs, as indicated by the duly authorized and sworn state-

ments of Messrs. Sieveking and Spoliansky and confirmed by Bridgeland, either intends to or will call Bridgeland or any other attorney from Taft as a witness in this case.

54) Any testimony Mr. Bridgeland could offer as a witness on behalf of plaintiffs would be cumulative or relate to matters uncontested or not in issue in this case.

## CONCLUSIONS OF LAW

55) The applicable ethical standards are the Canons, Ethical Considerations and Disciplinary Rules embodied in the Code of Professional Responsibility as adopted by the Supreme Court of Ohio, and such other rules as this Court may from time to time adopt. *See Model Federal Rules of Disciplinary Enforcement*, Rule IV, Ohio Supreme Court *Rules for the Government of the Bar*, Rule IV, S.D. Ohio Rule 2.6, and District–Wide Order 81–1, Rule IV.

56) This Motion concerns Code of Professional Responsibility Disciplinary Rule 5–102(A) of the Supreme Court of Ohio, which provides:

(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns, or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4).

57) DR 5–101(B) enumerates the following four exceptions to this Rule:

(1) If the testimony will relate solely to an uncontested matter.

(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.

(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

58) A party's right to select its own counsel is an important public right and a vital freedom that should be preserved; the extreme measure of disqualifying a party's counsel of choice should be imposed only when absolutely necessary. *Melamed v. ITT Continental Baking Co.*, 592 F.2d 290, 293 (6th Cir.1979); *Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1577 (Fed.Cir.1984).

59) Motions to disqualify opposing counsel often provide the movant with a decisive advantage and should be viewed with extreme caution. *General Mill Supply Co. v. SCA Services, Inc.*, 697 F.2d 704, 713 (6th Cir.1982).

60) Under the Sixth Circuit rule enunciated in *General Mill Supply*, the judgment of a sophisticated and informed client as to how best to conduct its case and protect its interests in determining to call or not to call counsel as a witness should be highly respected and accorded great deference.

61) The plaintiffs in this case are sophisticated, have been fully informed of the issues involved, and have concluded that they will not call Bridgeland or other Taft attorneys as witnesses on their behalf.

62) While the disqualification of the attorney in the *General Mill Supply* case was upheld, it is significant that in that case: 1) the disqualified attorney was a necessary and essential witness as he was the only witness available to testify as to a certain conversation, 2) without the attorney's testimony his clients' case would fail, and 3) the attorney could not stipulate that he would not testify on behalf of his clients. Mr. Bridgeland is not a necessary, essential or sole witness to the transactions at issue in this case; there is ample evidence, aside from Bridgeland's testimony, to sufficiently present and resolve the claims set forth by plaintiffs; Bridgeland has stipulated that he will not be a witness on behalf of his clients and plaintiffs have made an informed decision to forego his

testimony. Disqualification of Bridgeland or the Taft firm, therefore, is inappropriate in this case.

63) Also, as distinguished from the *General Mill Supply* case, plaintiffs in the case at bar have not chosen to forego vital testimony in favor of representation as defendants have not established that Bridgeland ought to be called as a witness on behalf of plaintiffs. There are no competing interests between the roles of witness and advocate to adversely affect the fact-finding process. For that same reason, the concerns of jury confusion and prejudice to opposing counsel or to the defendants are not applicable in this case. The dual role argument is not persuasive for the disqualification of Bridgeland or the Taft firm in this case.

64) There is no need for an attorney to testify and no basis for his disqualification under DR 5–102(A) when the testimony the attorney could offer would either relate to uncontested issues or prove cumulative or corroborative of other testimony offered.

65) In the *General Mill Supply* case, the United States Court of Appeals for the Sixth Circuit instructs that Disciplinary Rules 5–102(A) and 5–101(B) should be applied by balancing three interests: "(a) the interest of the public in the proper safeguarding of the judicial process; (b) the interest of the defendants; and (c) the interest of the plaintiffs." *Id.* at 711.

66) The public interest demands an efficient use of judicial resources towards the just, speedy, and inexpensive remedy as addressed in Rule 1 of the Federal Rules of Civil Procedure. *See General Mill Supply Company*, 697 F.2d at 711. The interest of the public is that the integrity of the judicial process be respected and protected by assuring truthfulness of testimony. This concern, however, is not warranted where, as here, the attorney sought to be disqualified is not involved in a combination of roles as witness and advocate. Further, other aspects of the system and process can be adequately safeguarded by this Court which can properly monitor any effect Bridgeland's representation may have on settlement, discovery, stipulations of fact and professionalism in the courtroom. Those risks allayed, the public interest weighs heavily against disqualification in this case.

67) For those same reasons, the interests of defendants stem from the risks posed by the attorney's dual role as witness and opposing counsel. In this case, defendants are not handicapped or prejudiced since 1) Bridgeland will not be called as a witness on behalf of plaintiffs, 2) he is not a necessary or essential witness, and 3) credibility and impeachment are not key issues. Therefore, defendants' interests do not weigh in favor of disqualification.

68) The interest of plaintiffs is that they not suffer prejudice from testimony by their attorney which is adverse to their factual assertions or account of events. Disqualification is not appropriate where, as here, there is no specific proof that plaintiffs will suffer actual prejudice from their attorney's testimony if he is called by defendants; and where, as here, it is shown that the attorney will not contradict the factual assertions made by his clients. Further, disqualification is not proper where, as here, the clients do not have an interest in discrediting and impeaching their attorney's testimony. Bridgeland's deposition indicates that, if called as a witness by defendants, his testimony would support and not contradict plaintiffs' case. Significantly, plaintiffs would suffer prejudice if disqualification were ordered as Bridgeland and the Taft firm are distinctly valuable to the plaintiffs in this highly complex litigation. Therefore, plaintiffs' interests weigh against disqualification in this case.

## OPINION

Based upon the foregoing, the Court finds that plaintiffs have made a valid, effective and fully informed decision not to call Bridgeland or other Taft, Stettinius & Hollister attorneys as witnesses in this case, and that the interests of the public, plaintiffs and defendants weigh in favor of allowing the firm to act as trial counsel in this matter. Accordingly, there is no basis to disqualify Taft, Stettinius & Hollister

under DR 5–102(A) or (B) of the Code of Professional Responsibility. Defendant's Motion to Disqualify (doc. no. 21) is hereby DENIED.

IT IS SO ORDERED.