Geoffrey BAKER, et al., Plaintiffs,

v.

BP AMERICA, INC., Defendant/Third Party Plaintiff,

v.

CIMCAST CORP., Third Party Defendant.

Civ. A. No. 90CV0911.

United States District Court, N.D. Ohio, E.D.

May 24, 1991.

See also 749 F.Supp. 840.

Byron S. Krantz, Karl E. May, Joshua R. Cohen, Donald S. Scherzer, Kohrman, Jackson & Krantz, Cleveland, Ohio, for plaintiffs.

Mark J. Valponi, Stephen M. O'Bryan, Kelley, McCann & Livingstone, Cleveland, Ohio, for defendant.

## MEMORANDUM AND ORDER

ALDRICH, District Judge.

BP America, the defendant and third-party plaintiff in this case, has moved to compel the deposition of Byron Krantz. Krantz had some involvement, as well as a financial interest, in the transactions at issue in this securities fraud case, and he and his law firm represent all of the plaintiffs and the third-party defendant. Krantz resisted BP's attempts to depose him on the ground that it is generally inappropriate to depose opposing counsel. BP also filed a motion to disqualify Krantz and his law firm from further participation in this case,

emphasizing that the Code of Professional Responsibility bars an attorney from appearing as counsel in a case where the attorney also may be an important fact witness. The Court finds both of BP's motions to be well-founded: Krantz and the law firm of Kohrman Jackson & Krantz are therefore disqualified from further participation in this case, and BP's motion to compel Krantz's deposition is granted.

### I.

Geoffrey Baker, the Hawk Corporation, and Walter Wright brought this securities fraud claim against BP America, Inc., under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5; the complaint also includes pendant state law claims for fraud and breach of contract. BP responded with a counterclaim against the three plaintiffs for contribution, and a third-party complaint against Cimcast Corporation for contribution and indemnification for all but the breach of contract claim. In a memorandum and order on October 23, 1990, this Court dismissed those portions of BP's counterclaim and third-party complaint seeking (1) indemnification under § 10(b) and Rule 10b–5 and (2) contribution and indemnification for common law fraud, but the Court sustained BP's claims for contribution under § 10(b) and Rule 10b–5. *Baker v. BP America*, 749 F.Supp. 840 (N.D.Ohio 1990).

The Court previously described the allegations as follows:

Baker, Wright, and Gary Worner—a BP employee—together formed Cimcast Corporation in May 1988 to acquire BP's Cast Alloy Parts Venture ("the Venture"). Baker, Wright, and Hawk Corporation—an investment group formed to acquire an interest in Cimcast—purchased Cimcast shares. Cimcast successfully acquired the Venture's assets and technology, but the Venture did not prove to be the profitable investment envisioned by the plaintiffs.

BP sold the Venture as part of its corporate efforts to divest itself of hold-

ings outside the petroleum industry. The Venture manufactured commercial metal products known as "custom near-net shape castings", and it claimed to do so by means of a newly developed and technologically advanced process. According to the plaintiffs, BP materially misrepresented the Venture's potential, including information concerning its sales record and the viability of its technology. Allegedly, the principal source of this misinformation was Worner, the BP employee in charge of the Venture. According to the plaintiffs, Worner had first misrepresented these facts to BP in order to prevent BP from abandoning the project, and then continued these misrepresentations to further BP's efforts to find an outside buyer. The plaintiffs contend that they relied upon these misrepresentations in purchasing Cimcast stock. The plaintiffs also contend that BP breached the "asset transfer agreement" which required BP to convey certain "developed technology" to Cimcast; the plaintiffs contend that such technology did not exist.

BP denies these allegations and contends that any losses experienced by the plaintiffs were the result of their own actions. BP also claims that Cimcast purchased the Venture's assets "as is", without any warranties or representations, and that the plaintiffs are thus barred from seeking compensation from BP for their losses. BP emphasizes that Baker and Wright spent several months on the premises of the Venture's operations, evaluating its potential and soliciting possible investors. In the event it is held liable, BP contends that it would be entitled to contribution from all three plaintiffs and Cimcast. BP argues that the three plaintiffs knew of the "misrepresentations" in seeking investors for Cimcast, and that they therefore should be held liable proportionate to their wrongdoing if there is any judgment entered against BP. BP also seeks contribution and indemnification [from] Cim-

cast itself. BP asserts that any liability against it could arise only from misconduct by Worner; according to BP, BP and Cimcast entered into an indemnity agreement whereby, among other things, Cimcast agreed to indemnify BP against claims for any misconduct by Worner. Worner apparently became an employee of Cimcast once BP transferred the Venture's assets. Second, BP claims that Worner was acting as an agent (or *de facto* agent) of Cimcast during the relevant times, and that Cimcast—and not BP—therefore should be held liable for any misconduct by Worner.

*Id.* at 841–42.

Baker, Hawk, and Wright (the three plaintiffs) and Cimcast are all represented in this case by the law firm of Kohrman Jackson & Krantz, including attorney Byron S. Krantz. BP alleges that Krantz was an active participant in the transactions at issue in this case, and that he had a personal financial stake in the outcome of the litigation.

It is undisputed that Krantz was an investor in and corporate officer of Hawk, the investment group which purchased a majority of Cimcast's share. Hawk is a closely held Delaware corporation in which Krantz held a minority interest.[1] Krantz has been listed as Hawk's vice-president and corporate secretary, and he also sits on its Board of Directors. Furthermore, Krantz participated in the negotiations surrounding the transfer of BP's Cast Alloy Parts Venture to Cimcast, and he represented Hawk at the closing. An associate in Krantz's law firm, Donald Kronenberg, also participated in the negotiations and was present at the closing.

Following the transfer of the Venture to Cimcast, Krantz became a member of Cimcast's Board of Directors and served as its corporate secretary. The Cimcast shares which Hawk acquired were distributed to Hawk's three shareholders as a dividend, and thus Krantz is now a Cimcast share-

---

1. Krantz owned 10% of Hawk's stock; the remaining 90% of the stock was held equally by investors Norm Harbert and Ronald Weinberg.

holder.[2] In November 1989, Krantz personally loaned more than $200,000 to Cimcast, and, in February 1990, Krantz signed the termination letter when Cimcast fired Gary Worner, who the plaintiffs now maintain misrepresented the viability of the Venture while still employed by BP. BP also points out that Baker has testified that he and Wright discovered Worner's alleged misrepresentations in October 1989; as noted, Worner was not fired for another four months and, in the interim, Krantz made a sizable personal loan to Cimcast. Finally, Krantz was in charge of negotiating a lease for Cimcast and, according to Baker's deposition testimony, Krantz delayed in fulfilling this obligation for several months, possibly causing a substantial financial loss to the company.

While conceding most of these facts, Krantz attempts to minimize their significance. First, through a sworn affidavit, he states that another Hawk shareholder, Norman C. Harbert, was primarily responsible for Hawk's investment in Cimcast, and Krantz casts his own role as that of a passive investor. Krantz states that he signed documents as an officer and director of Hawk "strictly as an accommodation to Hawk's other shareholders, officers, and directors, in keeping with attorneys' general practice of signing contracts for their corporate clients to facilitate the closing of a transaction." Second, while conceding that his law firm represented Hawk in Cimcast's acquisition of the Cast Alloy Parts Venture from BP, Krantz states that he "personally performed almost none of this work," but that principal responsibility was assumed by attorney Kronenberg of Krantz's law firm.[3] Finally, Krantz states that he had "absolutely no involvement in the running of Cimcast on a day-to-day basis" but rather confined his activities to "reviewing the initiatives of others and pro-

viding legal advice to the extent necessary." Krantz concedes preparing Worner's termination letter, but states that he did so in "carrying out the decision of others to terminate Mr. Worner." Regarding the delay in Cimcast's lease, Krantz points out that the delay would only go to the issue of damages, and he suggests that other witnesses could testify to what he views as the only critical fact: that Cimcast's facilities opened late, which BP contends cost Cimcast $300,000.

## II.

BP initially raised Krantz's participation as both counsel and a potential witness in the form of a motion to compel Krantz's deposition. BP represented that Krantz initially agreed to be deposed, but, when BP served him with a formal deposition notice, Krantz responded that he would not attend the deposition. In addition to making numerous compelling arguments concerning its need for Krantz's deposition because of his role as a fact witness, BP suggested that an early deposition would be appropriate to determine whether Krantz's involvement in, and knowledge of, the events at issue in this case were significant enough to warrant his disqualification as counsel. In responding to BP's motion to compel his deposition, Krantz argued that his role in the events at issue in this case was secondary, and he suggested that BP could obtain the information it desired from him through the less extreme means of written interrogatories. Krantz also stated that his deposition testimony would be duplicative and cumulative of that which BP could obtain from other sources, and he argued that BP should conduct other discovery first to determine whether it had any "legitimate need" for his deposition testimony. Subsequently, BP moved for disqualification, raising the same argu-

---

**2.** Hawk itself no longer holds any interest in Cimcast.

**3.** BP subsequently submitted an affidavit from one of its corporate attorneys, Peter D. Wilbur, who participated in negotiating the asset transfer agreement. According to Wilbur, Krantz played a leading role on behalf of Hawk, and

attorney Kronenberg was unable to negotiate anything without approval from Krantz. Significantly, while Krantz filed a surreply brief discussing Wilbur's affidavit, he did not dispute these precise points concerning Krantz's and Kronenberg's relative roles in the negotiations.

ments.[4]

The Court concludes that Krantz and his law firm must be disqualified from further participation in this case; accordingly, Krantz's objections to appearing for deposition are moot, and the Court will grant BP's motion to compel Krantz's deposition. However, BP's motion for sanctions under Federal Rule of Civil Procedure 37(b) is denied.

### A.

This Court's decision to disqualify Krantz and his law firm is based on Disciplinary Rules 5–101(B) and 5–102 of the Code of Professional Responsibility.[5] Those rules provide as follows:

> DR 5–101 REFUSING EMPLOYMENT WHEN THE INTERESTS OF THE LAWYER MAY IMPAIR HIS INDEPENDENT PROFESSIONAL JUDGMENT.
>
> (A) Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.
>
> (B) A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness, except that he may undertake the employment and he or a lawyer in his firm may testify:
>
> (1) If the testimony will relate solely to an uncontested matter.
>
> (2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.
>
> (3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.
>
> (4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.
>
> DR 5–102 WITHDRAWAL AS COUNSEL WHEN THE LAWYER BECOMES A WITNESS.
>
> (A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4).
>
> (B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.

Ethical Consideration 5–9 elaborates on the potential problems of an attorney appearing as both witness and advocate:

> EC 5–9 Occasionally a lawyer is called upon to decide in a particular case whether he will be a witness or an advocate. If a lawyer is both counsel and witness, he becomes more easily impeachable for interest and thus may be a less effective witness. Conversely, the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility. The rules of an advocate and of a witness are inconsistent; the function of an advocate is to advance or ar-

---

4. In the alternative, BP suggested that the Court could order Krantz's deposition, if additional facts appeared necessary, before ruling on the motion to disqualify.

5. The Supreme Court of Ohio has adopted the Code of Professional Responsibility which is binding on Mr. Krantz as a member of the Ohio Bar. Rule IV, Ohio Rules for the Government of the Bar.

gue the cause of another, while that of a witness is to state facts objectively.

As DR 5–101(B) indicates, there are a number of instances where the lawyer's testimony will not significantly impair the lawyer's role as advocate and, in extraordinary cases, the lawyer may remain in the case in order to avoid undue hardship to the client. However, as EC 5–10 explains, "doubts should be resolved in favor of the lawyer testifying and against his becoming or continuing as an advocate." [6]

■ This Court recognizes that motions to disqualify counsel should be considered with extreme caution, in view of the litigant's interest in retaining counsel of the litigant's choice, and the danger that the opposing party might use a motion to disqualify to achieve tactical advantage. *See Paretti v. Cavalier Label Co., Inc.*, 722 F.Supp. 985 (S.D.N.Y.1989); *see also Evans v. Artek Systems Corp.*, 715 F.2d 788, 791–92 (2d Cir.1983). This Court also recognizes that great care must be taken before disqualifying an attorney since interlocutory appeals are generally unavailable from such orders. *See Richardson–Merrell, Inc. v. Koller*, 472 U.S. 424, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985); *In re Mechem*, 880 F.2d 872 (6th Cir.1989); *Kahle v. Oppenheimer & Co., Inc.*, 748 F.2d 337 (6th Cir.1984). Nevertheless, neither the Sixth Circuit Court of Appeals nor the Supreme Court of Ohio have hesitated to rule that an attorney whose testimony would cause a conflict under DR 5–101(B) or DR 5–102 must either voluntarily withdraw from the case or face disqualification. *General Mill Supply Co. v. SCA Services, Inc.*, 697 F.2d 704 (6th Cir.1982)[7]; *Mentor Lagoons, Inc. v. Rubin*, 31 Ohio St.3d 256, 260, 510 N.E.2d 379, 382 (Syllabus 2) (1987). In *General Mill Supply Co.*, for example, the Circuit upheld the disqualification of an attorney in a suit alleging abuse of process in prior litigation. The attorney's allega-

tions concerning the prosecution of the prior case were central to the plaintiff's lawsuit in *General Mill Supply Co.*, and the court of appeals rejected the attorney's argument that he could prove his case with evidence other than his own testimony; the court also noted the inherent difficulties which would arise if the defendants were forced to attempt to discredit the testimony of a witness who was also the plaintiff's trial attorney.

■ BP directs this Court's attention to a number of securities cases where an attorney with significant involvement in the underlying transaction was disqualified by the trial court. *E.g., Gary Plastic Packaging Corp. v. Merrill Lynch*, 119 F.R.D. 344, 349–50 (S.D.N.Y.1988), *aff'd on other grounds*, 903 F.2d 176 (2d Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 675, 112 L.Ed.2d 667 (1991) (attorney was officer and shareholder of closely held corporation and participated in purchase of CDs which led to charges of securities fraud against broker; in addition, broker presented evidence that corporation, possibly with attorney's knowledge, continued to purchase CDs under same terms even after learning of purported fraud); *Liess v. General Electric Co.*, 659 F.Supp. 979 (N.D.Ill.1987) (attorney participated in negotiations where defendant purchased all the shares of corporation owned by plaintiffs, with purchase price partly contingent on corporation's future performance; attorney was important fact witness relative to parties' understanding of defendant's obligations in managing corporation after acquisition, and defendant proffered evidence suggesting that attorney's testimony would be necessary at trial to support defendant's theory of the case); *see also Acme Analgesics, Ltd. v. Lemmon Laboratory*, 602 F.Supp. 306 (S.D.N.Y.1985) (disqualification of attorney who was major shareholder in corporation

---

6. The Code of Professional Responsibility also counsels against a lawyer appearing in a case where both he and his client have a financial interest. EC 5–3, 5–7. While BP has not based its motion to disqualify Krantz on this theory, Krantz's continuing personal financial interest in this litigation also suggests that any doubts should be resolved in favor of disqualification.

7. *General Mill* was decided shortly before the Sixth Circuit determined that interlocutory appeals were unavailable in attorney disqualification cases. *See Kahle*, 748 F.2d at 339 (Wellford, J., concurring).

and negotiated, executed, and administered contract upon which lawsuit was based).

On the other hand, Krantz points to *Banque Arabe Et Internationale D'Investissement v. Ameritrust Corp.*, 690 F.Supp. 607 (S.D.Ohio 1988), also a securities case, where the court refused to disqualify plaintiff's attorney, even though the attorney had been present at and participated in negotiations of a transaction which was critical to the lawsuit. The district court found that the plaintiffs made a fully informed decision to forego calling the attorney as a witness to support their claim, and the court also found much of the attorney's potential testimony to be peripheral and largely cumulative of evidence which could be presented through other witnesses. In addition, the district court found that the attorney should not be disqualified because he was a potential defense witness since the attorney's testimony would support the plaintiff's theory of the case and "credibility and impeachment are not key issues." *Id.* at 614.

In this case, the Court reluctantly concludes that Krantz and his law firm must be disqualified in view of Krantz's significant involvement in the events underlying this lawsuit, and the fact that Krantz may likely be an important witness for several of the parties should this case proceed to trial. Unlike in *Banque Arabe*, the attorney's testimony in this case would be neither peripheral nor necessarily cumulative of other evidence, and Krantz's credibility may become an important issue for trial; moreover, Krantz's testimony might not strictly support his clients' factual contentions.

As already discussed, Krantz was Hawk's principal negotiator when Hawk invested in Cimcast; Hawk participated in the negotiations with BP when BP transferred the Cast Alloy Parts Venture to Cimcast. BP is defending this suit, in part, on the theory that it sold the Venture to Cimcast "as is", and Krantz's understanding of what "as is" meant may well be significant evidence. Cases such as *Liess* and *Acme Analgesics* suggest that Krantz's role in the negotiations should

preclude him from appearing as counsel in this case. In addition, Krantz is a sophisticated securities lawyer who advised and represented the Hawk investors; Krantz was also a director, officer, and shareholder in Hawk himself. As BP has pointed out, the plaintiffs are required to prove "reliance" to sustain their cause of action under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5; the sophistication of the investors, and whether they should have exercised "due diligence" before making their investment, are relevant factors in determining whether such reliance was reasonable. *Molecular Technology Corp. v. Valentine*, 925 F.2d 910, 918 (6th Cir.1991); *Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1015–16 (2d Cir.1989); *Bruschi v. Brown*, 876 F.2d 1526, 1529 (11th Cir.1989); *Kennedy v. Josephthal & Co., Inc.*, 814 F.2d 798, 804–05 (1st Cir.1987). Whether Krantz should have advised Hawk to evaluate Cimcast and the Venture more closely, or whether he should have discovered the alleged "misrepresentations" himself as Hawk's attorney, are relevant issues which can be explored only through Krantz's testimony.

Krantz's testimony concerning events which occurred after BP transferred the Venture to Cimcast may also become critical. For example, Baker has testified that he discovered Worner's alleged misrepresentations as early as October 1989, yet Cimcast did not fire Worner until the following February; Krantz signed Worner's letter of termination, and the text of the letter indicates that Krantz participated in the firing decision. Also, if Worner's misrepresentations were known to Cimcast as early as Baker has testified, it becomes curious that Krantz was willing to personally lend more than $200,000 to Cimcast in November 1989. *Cf. Gary Plastic*, 119 F.R.D. at 349 (attorney/officer could testify concerning corporation's continued purchase of securities after alleged "fraud" was discovered). There are several possible scenarios which could explain this chain of events, but Krantz's testimony will be

necessary to develop the facts.[8] Finally, if the plaintiffs establish liability in this case, Krantz's delay in negotiating Cimcast's lease—which BP alleges cost Cimcast $300,000—would become a critical factor in assessing damages. Additionally, the Court notes that Krantz's involvement in those lease negotiations appears inconsistent with his sworn affidavit, submitted in opposition to the motion to disqualify, that he had "absolutely no involvement in the running of Cimcast on a day-to-day basis" but rather confined his activities to "reviewing the initiatives of others and providing legal advice to the extent necessary."

### B.

Since the Court concludes that Krantz and his law firm must be disqualified from this case, it follows that Krantz's grounds for resisting a deposition are now moot; BP's motion to compel that deposition must therefore be granted. However, the Court denies BP's motion for sanctions based on Krantz's failure to appear for the deposition which BP noticed in November 1990. The affidavits of counsel indicate that Krantz initially agreed, on an informal basis, to be deposed; when BP formally noticed the deposition, Krantz promptly informed BP that, upon consideration, he had concluded that it would be inappropriate to appear for the deposition because of his role as counsel in the case. While the Court believes that Krantz must now be disqualified from this case and appear for

deposition, it cannot conclude that Krantz's failure to appear for a deposition, before this issue was resolved, was not "substantially justified." Fed.R.Civ.P. 37(b).

### III.

The Court disqualifies attorney Byron Krantz and the law firm of Kohrman Jackson & Krantz from further participation in this case, and it orders the plaintiffs and third-party defendant to obtain new counsel (or be prepared to proceed *pro se*) within thirty days from the date of this order.[9] BP's motion to compel Byron Krantz to appear for deposition is granted, and the Court directs the parties to schedule a mutually convenient time for that deposition promptly after the plaintiffs and third-party defendant obtain new counsel. BP's motion for sanctions under Federal Rule of Civil Procedure 37(b) is denied.

The Court further schedules this matter for a status conference on July 10, 1991, at 4:00 p.m., Room 212, United States Courthouse, Cleveland, Ohio, to ensure the readiness of this case for trial, to initiate disposition by settlement, dispositive motion, or other means, and to facilitate the completion of discovery.

IT IS SO ORDERED.

---

**8.** For example, Baker, who is one of the plaintiffs in this case, might have failed to relay his suspicions about Worner's misrepresentations to the Cimcast officers, which could create a tension in the plaintiffs' litigation strategy. Alternatively, Baker's deposition testimony might be false or mistaken, in which case Krantz would have to take a factual position opposed to that of one of his clients. Finally, the plaintiffs might have only attached significance to Worner's "misrepresentations" after Cimcast failed to meet their high expectations, in which case the causal relationship between the misrepresentations and the claimed damages could become tenuous. *Cf. Banque Arabe,* 690 F.Supp. at 614 (attorney's testimony would undoubtedly support his client's theory of the case).

**9.** The Court notes, based on the facts and allegations presented thus far, that there is some po-

tential for a conflict of interest if the same attorney undertakes to represent all three plaintiffs and Cimcast. Specifically, BP has offered a defense that Baker and Wright spent a significant amount of time on the Venture's premises evaluating its potential, and that they knew (or should have known) precisely how viable the Venture's technology was. Baker and Wright also solicited the investment of the Hawk corporation. If these facts develop as BP predicts, it is possible that Hawk might have a cross-claim against Baker and Wright for misrepresenting the potential of the Venture to the Hawk investors. Therefore, if Baker, Wright, Hawk, and Cimcast all retain the same counsel, the Court expects that counsel will carefully explain the potential for a conflict of interest, and the implications thereof, before undertaking any such representation. *See* DR 5–105.